**C. R. INVESTMENTS, INC.,**
**Petitioner, Appellant,**

v.

**VILLAGE OF SHOREVIEW, Respondent.**

**No. 50514.**

Supreme Court of Minnesota.

March 13, 1981.

Doherty, Rumble & Butler and Bruce C. Faulken, Minneapolis, for appellant.

Jerome P. Filla, St. Paul, for respondent.

SCOTT, Justice.

Appellant brought this mandamus action to require the Village of Shoreview to issue it a special use permit. Although the district court concluded that the Village had properly denied appellant's application, our review of the village council's reasons for its refusal to issue the permit and the factual basis for these reasons requires us to conclude that the refusal to issue the permit was arbitrary and unreasonable. We reverse and direct that the permit be issued.

In 1967 the village adopted a comprehensive development plan consisting of 6 planning reports and a comprehensive planning map showing land uses, community facilities, and a transportation plan. In 1968 the

village enacted a zoning ordinance and a platting ordinance to implement the development standards portion of the comprehensive plan. Appellant is the owner of a 19.3 acre tract, the north 11.5 acres of which are shown on the comprehensive planning map as "low density-residential (0–4 units/acre)" and the south 7.5 of which are shown as "natural open space." That area is part of a marshy wildlife habitat known as Lake Martha. The entire tract was zoned R–2 residential by section 209.-050 of the village's zoning ordinance, a classification allowing use of the land for multiple family dwellings if a special use permit is granted by the council.

The tract is bordered on the west by a large group of multiple dwellings which had been built in 5 stages in an area designated medium density on the comprehensive planning map. It is bordered on the east by a right-of-way for a Northern States Power Company powerline, on the other side of which are some single-family dwellings, on the south by Lake Martha, and on the north by County Road G–2, on the north side of which are a number of single-family dwellings on large lots. Appellant's proposed use of the property was to construct 19 "quad homes," each to have 4 apartments, all of which were to be constructed on the north 11.5 acres of the tract, and to leave the rest of the tract natural open space. Between July 1978 and January 1979, appellant had presented to the village planning commission two other plans for a development containing single-family and 2-family homes as well as multiple dwellings, but these plans had been disapproved.

In January 1979 appellant presented the plan for construction of the 19 quad-home units to the planning commission. Some members were critical of the plan design, which permitted a few garages to face County Road G–2, and some suggested that there might be traffic problems if people came through the development in large numbers to reach the open space south of it. The commission referred the proposed use to Michael Black, the city planner, for study. Subsequently he presented the commission a report recommending approval of

the permit application and preliminary plat, stating that in his opinion the proposed use would not have an adverse effect on the public health, safety, and welfare. He also informed the commission that the city attorney had interpreted the zoning ordinance as permitting the proposed density, which was 6.55 units per acre based on the north 11.5 acres and 3.94 units per acre based on the entire tract.

On February 13, 1979, the planning commission held a public hearing on the proposed permit. The minutes for this meeting reveal that several owners of single-family homes in the vicinity expressed objections to use of the land for multiple rather than single dwellings and complained that the project was not in harmony with the area, would result in increased traffic, and might be detrimental to wildlife in the Lake Martha area. Some expressed concern about the effect of the development on property values. There was also a complaint that trees to be planted between the single-family homes and the quad home development would not become a buffer for several years. Following this discussion a motion to recommend approval of the special use permit was defeated 4 to 2. Thereafter, James Hill, the designer of the proposed development, requested a statement of the commission's reasons for its refusal to recommend approval of the permit. The chairman responded that the reasons had been "no sufficient buffer; plat incompatible in orientation; not consistent with general intent of the comprehensive plan."

At a meeting on February 20, 1979, the council considered the plan, which had been amended to provide that the 7.5 acres of open space would be dedicated to the village for parkland. The minutes of this meeting show that Black expressed the opinion that the access points to County Road G–2 were suitable, and that Hill advised the council that the plan's proposed density, design, and lot sizes complied with the zoning ordinance, that the open spaces would be landscaped, and that the units would cost about $60,000 and would meet the needs of young families and older fami-

lies wanting smaller homes. In response to questions of council members about the effect of neighbors' views and about what criteria it should apply in considering appellant's request, the village attorney advised them of section 209.040 of the zoning ordinance, which provides:

The Village Council may grant a special use permit after the Village Council has considered the advice and recommendations of the Planning Commission and the effect of the proposed use upon the health, safety, morals and general welfare of occupants of surrounding land, existing and anticipated traffic conditions, including parking facilities on adjacent streets and land, and the effect on value of property in the surrounding area, and the effect of the proposed use on the comprehensive municipal plan. If the Village Council shall determine that the proposed use will not be detrimental to the health, safety, morals, on [sic] general welfare of the community, nor will cause serious traffic congestion or hazards, nor will seriously depreciate surrounding property values, and that said use is in harmony with the general purpose and intent of this Ordinance and the comprehensive municipal plan, the Village Council may grant a special use permit.

Upon being informed of this provision, the council agreed that the proposed use would not seriously depreciate values of the surrounding properties, but questioned whether buyers could add bedrooms to their units by utilizing expansion space, whether traffic congestion would result if the development were permitted, and whether the fire department could act effectively in the area. They suggested that the permit if issued require a turn-around space in driveways terminating at the County Road so that automobiles coming onto the road from the units could enter it head first, and the village attorney suggested that any permit also could be conditioned to require that the units not be modified to include additional bedrooms. Council member Weyandt then offered a motion—

asking the staff to draw up a statement for issuance of a denial of the special use permit, that is findings of fact, and I guess I would move to have a finding of fact drawn up by the staff for denial of the special use permit for the reasons, including but not limited to, the traffic problems, the density problems in relation to total density in the consideration of the outlot [the south 7.5 acres] and whether it should be considered or not, the inadequate definition by the developer in his proposal how exactly those lots are to be used. The failure of recommendation by the Planning Commission and the perception in consideration of adjacent property and the effect of their property values and the use of their land and, therefore, their health, safety and general welfare. That would be my motion for a finding of fact, and, I guess, if I could clarify that a bit that would also require a staff to come in with some facts about traffic, etc.

The motion was seconded and carried.

The council again considered the matter at a meeting on March 19, 1979. Black informed them that a representative of the county engineering department had told him that traffic generated by the project would not result in a traffic problem on County Road G-2. He also said that the fire chief had stated that the driveways and roads were sufficiently wide but recommended that parking be allowed on one side of collector streets and not be allowed in driveways. The city planner then submitted a resolution denying the permit for the following reasons: (1) The adverse recommendation of the planning commission for the reasons its chairman had given; (2) the proposed use is detrimental to the welfare of the community because the site plan indicates insufficient buffer from existing single-family homes and does not indicate a construction pattern consistent with the orientation of such homes; (3) the site plan indicates potential traffic hazards because of direct access from some of the units to County Road G-2; (4) emergency vehicle access does not permit parking on both sides of interior streets and in driveways, so

parking facilities are inadequate; (5) the proposed use is not in harmony with the general purpose and intent of the comprehensive plan because the building orientation is not in harmony with the existing neighborhood, the developer has not demonstrated that the proposed use is an improvement in the development plan for this part of the city, and in this area the "highest design standards" are necessary to achieve neighborhood compatibility; (6) the proposed site plan does not indicate bedroom capacity, making it impossible to determine adequacy of lot sizes; (7) the developer has not demonstrated how dwelling unit expansion will be restricted to insure continuing adherence to zoning regulations.

In the following discussion Black stated that he did not know of any other permit for multiple housing which had required the parking restrictions recommended by the fire chief. Hill argued that the proposed use would meet a housing need and was a good land use, pointing out that the open space complied with the comprehensive planning map and arguing that the quad home construction would be consistent with the land use to the west and would be buffered from the single-family homes on the north by the County Road and on the east by the NSP right-of-way, on which appellant intended to plant trees. Hill said also that the lot sizes met the zoning requirements for planned 2- and 3-bedroom units and that once it had sold the homes appellant could not control the purchasers' use of expansion space. One council member said that he understood that a traffic control problem exists at the corner of Lexington Avenue and County Road G–2 and expressed concern about the effect of additional housing units. There was some discussion about the adequacy of parking space and whether the plan should have placed single-family homes next to the NSP right-of-way as a "buffer" between the multiple dwellings and the single-family homes on the other side of the right-of-way. Councilman Weyandt stated that the community's "perceptions" were that it is desirable to have single-family units and to avoid "intense development." He then moved to deny the permit for the reasons stated in the resolution and additionally—

> The reasons that have been brought out at this meeting tonight, specifically, the lack of buffering and density between the single and quad units. The increased traffic causing problems on the County Road G–2 in regard to traffic control, not the design of the streets, but rather the traffic control. The insufficient provision for off-street parking in the plat, in light of the recommendation by our fire chief for no parking in certain areas of the development. Because of lack of definition of the exact density because there is room for expansion within the units, and therefore, the number of bedrooms are not specified and there has been inadequate showing of the density proposed in the development. For the fact that under provision of Shoreview Code, and I am not sure of the number but I think it is 209.030, there has not been a demonstration by the developer of this development proposed being equal to or better than single-family use.

The motion was seconded, and the council unanimously voted to deny the permit.

The district court upheld the council's denial after concluding that its reasons were legally sufficient, that at least some were reasonably supported by the evidence, and that as a consequence the denial of the permit had not been arbitrary or capricious and had not denied appellant equal protection of the laws. Having determined that the denial was in fact arbitrary and capricious, we need not reach the second issue.

We have recognized that when a zoning ordinance expressly authorizes the proposed use by special permit in the discretion of the governing body of a municipality, the denial of such a permit must be for reasons relating to public health, safety, and general welfare. *Hay v. Township of Grow*, 296 Minn. 1, 206 N.W.2d 19 (1973); *Zylka v. City of Crystal*, 283 Minn. 192, 167 N.W.2d 45 (1969). In one case we found incompatibility between the proposed use and a municipality's comprehensive munici-

pal plan was also a legally sufficient reason for denying a special use permit. *Barton Contracting Co. Inc., v. City of Afton*, 268 N.W.2d 712 (1978). A recent decision settled also that the scope of our review in zoning matters is that applied to the decision of an administrative agency, requiring that we focus on the decision of the village council independent of the findings and conclusions of the trial court. *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865 (Minn.1979). We are thus required to assess the legal sufficiency of the reasons given by the council and to determine whether, if legally sufficient, they had a factual basis. Applying these principles, we examine the record.

■ The first reason given by the council for denying the requested permit was the recommendation of the planning commission. The minutes of the commission's meetings show only that several owners of single-family homes opposed use of the tract for construction of multiple dwellings and expressed "concerns" about traffic, property values, and density. The minutes also show that the commission members expressed "doubts" concerning the effect of the proposed use on traffic, the adequacy of buffering and parking space, and the compatibility of the proposed use with the comprehensive municipal plan. Without addressing the legal sufficiency of the reasons given by the commission for its adverse recommendation, we are required to conclude that its stated reasons do not have factual support in the vague reservations expressed by either the single-family owners or the commission members. Consequently, the commission's recommendation does not support the council's action.

■ Two reasons advanced by the council for denying the permit relate to traffic. One was that the site plan indicated potential traffic hazards because of direct driveway access from a few of the quad homes onto the county road. The council had been informed, however, that the road could accommodate increased traffic, and appellant can eliminate any hazard from automobile backing onto the road by furnishing turn-

around areas in the driveways. The other reason, that increased traffic would cause problems on the county road "in regard to traffic control as opposed to the design of streets," apparently is based on the statement of one council member that he had been told of a problem existing at one intersection and his opinion that additional housing units might aggravate that problem. There is no evidence warranting an inference that the aggravation would be substantial, however, and the contrary inference may be drawn from the conclusion of the county engineering department that the development would not create traffic problems. We conclude that the reasons relating to traffic do not justify denial of the permit even though they would have been legally sufficient had the record demonstrated a factual basis for them.

■ Two reasons advanced for denying the permit related to allegedly inadequate parking facilities. One was that emergency vehicle access would not permit parking on both sides of certain streets, as a consequence of which the council concluded that the site plan did not provide adequate parking facilities. The council also concluded that offstreet parking would be insufficient because the fire chief had recommended that parking should not be allowed in driveways. The record does not contain evidence that these restrictions would result in inadequate parking. The parking areas planned are twice the minimum required by the zoning ordinance, the driveways and roads are of sufficient width, and the restrictions in parking recommended by the fire chief would require only that some of the apartment owners keep their automobiles in their garages or in turn-around areas adjacent to the driveways. While the council could reasonably condition the special use permit upon appellant's furnishing such turn-around areas, the factual basis for denying the permit on the ground of inadequate parking facilities is clearly lacking.

■ Additional reasons for denial of the permit were that the proposed plan did not indicate bedroom capacity, from which the council concluded that it was impossible

to determine the adequacy of lot sizes, and that the developer had not demonstrated how dwelling unit expansion would be restricted to comply with the zoning ordinance. We hold both reasons legally insufficient. The alleged inability to determine the adequacy of lot sizes from the site plan furnished by appellant does not justify denial of the special use permit because the village can insure that the number of bedrooms per quad home unit complies with minimum lot sizes at the time appellant applies for a building permit. Nor does appellant's failure to demonstrate how dwelling unit expansion would be restricted justify denial of the permit because appellant obviously cannot control the use of the quad homes once it sells them. Denial of a special use permit cannot be based upon an applicant's failure to meet an impossible and unreasonable requirement.

The final reasons stated in the resolution adopted by the council are the following:

(2) Proposed use is detrimental to the welfare of the community because the site plan indicates insufficient buffer from existing single-family homes and does not indicate a construction pattern consistent with the orientation of existing single-family homes.

(5) The proposed use is not in harmony with the general purpose and intent of the Comprehensive Plan for the following reasons:

(a) The proposed site plan indicates building orientation is not in harmony with the existing neighborhood.

(b) It has not been demonstrated that the proposed use is an improvement in the development plan for this area of the City.

(c) In this area of the City, the highest design standards are necessary to achieve neighborhood compatibility.

To these the council added "lack of buffering and density between the single and quad units" and appellant's failure to establish, pursuant to section 209.030(A) of the village's zoning code, that its proposed use "is equal to or better than, single-family usage."

■ The claimed lack of buffering appears to be the result of the opposition of the owners of single-family homes to use of the tract for multiple dwellings and was explained by the city planner to refer to appellant's failure to plan single-family homes in the areas of the tract nearest the existing single-family homes. In fact, the zoning code does not require such a buffer and the city planner had earlier expressed the opinion that the County Road and the NSP right-of-way are sufficient buffers between the development and the single-family homes to the north and east. In the absence of evidence that the development will adversely affect the public health, safety, and welfare in the area or the value of surrounding property, the claimed lack of buffering cannot reasonably be advanced to deny the special use permit.

■ In assessing the legal sufficiency of the council's determination that the proposed use was not in harmony with the general purpose and intent of the village's comprehensive plan, we recognize that incompatibility between a proposed use, even though one permitted by a zoning code upon issuance of a special use permit, and a municipality's comprehensive municipal plan may in some circumstances be a legally sufficient reason for denying the special use permit. Thus, in *Barton Construction Co., Inc., v. City of Afton*, 268 N.W.2d 712 (Minn.1978) we found denial of a special use permit to conduct gravel mining on a farmland area which had been a buffer between a gravel mining operation and recreational, residential, and nature areas was based on legally sufficient reason when the municipal plan was "permeated with evidence of a strong desire to preserve the rural character and unique scenic beauty of Afton and the St. Croix Valley." 268 N.W.2d 717. In that case there was also considerable evidence of substantial risk that irreparable environmental damage would result from the proposed use.

In this case the municipality's comprehensive plan, although referring to its general purpose and intent, does not define them. The portions of the plan on which the vil-

lage relies as elucidating its general purpose and intent and as demonstrating incompatibility between the development appellant proposes and the plan, include the following:

Aesthetics and good urban design shall be an important factor in evaluating development proposals although these will not be the sole determinants leading to rejection or approval of proposed projects. Other considerations include: (a) effect on adjacent and nearby property values; (b) safety factors; (c) health considerations; (d) landscaping; (e) density or intensity of use; (f) light and air space; (g) traffic generation and flow patterns; and (h) other matters affecting the public welfare. [Comprehensive Village Plan, Part Two, Section III, C(A) 3].

The development plan will be continuously used as a framework for making decisions and all development proposals will be checked for conformity with the plan. A development proposal contrary to the plan will be recommended only when it is demonstrated that the proposal constitutes an "improvement" on the plan and is consistent with the plan's general intent and purpose. [Comprehensive Village Plan, Part Two, Section III, C(A) 5(a)].

Esthetic considerations such as the architectural style and general appearance of any proposed apartment project will be a major consideration but will not be the sole justification for approval or denial of any proposed apartment building. [Comprehensive Village Plan, Part Two, Section III, C(B) 8(b) 10].

The Planning Commission will look with disfavor upon the following design features that are considered inappropriate:

Architectural designs that are clearly incompatible with existing single-family structures adjacent and near to the proposed apartment development (for example, flat-roofed structures of such size, shape, and design as to resemble "army barracks" shall be considered as incompatible in most residential areas). Apartment structures that are proposed to be placed in rows along streets or otherwise have unimaginative site design features where more desirable alternatives are available on the land in question. [Comprehensive Village Plan, Part Two, Section III, C(B) 8(b) 13].

Nothing touches a citizen so personally as his daily environment. A healthful, safe, efficient and pleasant living area to return to at the end of the day is as essential to the well-being of a citizen as good physical conditions under which to work.

Shoreview is and will probably remain primarily a residential community. The history of urban areas clearly indicates that good residential areas may or may not remain pleasant places in which to live. It is essential that minimum standards be established for the development and maintenance of living areas within the Village.

Because roads, commercial establishments, churches, industrial uses, recreation areas, utilities and many other non-residential uses greatly affect living areas, there should also be development and maintenance standards set for these land uses. In general, public standards are the minimum desired to protect the general public health, safety, comfort, convenience, morals, and general welfare; they are not necessarily the highest desired standards.

Human values differ, social and economic status differs among areas, and certain legal restraints are present which require the setting of minimum, reasonable, and uniform standards, the "minimum" may be acceptable in one part of the community while in others, residents may desire higher standards. [Comprehensive Village Plan, Part Two, Section IV].

■ While the village relies on Part Two, Section III C(A)(5)(a), quoted above, as requiring appellant to demonstrate that its proposed use "constitutes an 'improvement' on the plan and is consistent with the plan's general intent and purpose," this provision in our opinion is unreasonably vague, and, with respect to the requirement that an

applicant demonstrate that the proposed use is an "improvement," also unreasonably subjective. The council's determination that the "highest design standards" were necessary in this area of the Shoreview to achieve neighborhood compatibility and its last ground for denial of the special use permit, appellant's alleged failure to establish that its proposed use "is equal to or better than, single family usage," must similarly be rejected as unreasonably vague and subjective requirements. Consequently, these reasons cannot be viewed as bearing a substantial relationship to the public health, safety, and welfare of the community and thus do not furnish grounds for denial of a special use permit.

We conclude that the village acted arbitrarily and capriciously in denying the requested special use permit for reasons which either had no factual bases or were not legally sufficient. Accordingly, we remand with directions that the council issue the permit subject, in its discretion, to the condition that appellant provide turn-around areas in the driveways serving the quad-home units.

Reversed.