Thor YANG, Relator,

v.

COUNTY OF CARVER, et al., Respondents.

No. C3–02–1460.

Court of Appeals of Minnesota.

May 20, 2003.

Richard G. Wilson, Virginia A. Bell, Laura J. Lindstrom, Maslon, Edelman, Borman Brand, L.L.P., Minneapolis, MN, for relator.

Paul D. Reuvers, Jason J. Kuboushek, Iverson Reuvers, L.L.C., Bloomington, MN, for respondents.

Considered and decided by WILLIS, Presiding Judge, SCHUMACHER, Judge, and ANDERSON, Judge.

## OPINION

ROBERT H. SCHUMACHER, Judge.

By writ of certiorari, relator Thor Yang appeals the decision of respondent County of Carver to deny his application for a conditional use permit, asserting that the denial is arbitrary and capricious because the county had no legally sufficient reason to deny and that the denial was motivated by discriminatory intent. Because the county had no legally sufficient reason to deny the permit, we reverse and remand.

## FACTS

In March 2002, Yang applied to the county for a conditional use permit to operate a custom slaughterhouse as a farm-related business on his 40–acre property in Hollywood Township. In a custom slaughterhouse, animals are purchased and slaughtered on-site; all meat derived from the slaughter is returned to the purchaser. *See* Minn. R. 1540.0010, subp. 7 (2000). The local zoning ordinance required Yang to obtain a conditional use permit because a farm-related business is a permitted conditional use within the zoning district. *See* Carver County, Minn. Zoning Ordinance No. 32S (2000).

The Carver County Board of Commissioners must find a proposed use meets the following criteria before the board may issue a conditional use permit:

> 1. The conditional use is permitted as a permitted conditional use within the zoning district, and meets all requirements of this ordinance and any other County, Regional, State, or Federal laws, ordinances, rules, or regulations.
>
> 2. The conditional use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted.
>
> 3. The establishment of a conditional use will not impede the normal and orderly development and improvement of surrounding vacant property for uses predominant in the area.
>
> 4. The effects of the proposed use will not be detrimental to the health, safety and welfare of Carver County or to the occupants of the immediate neighborhood.
>
> 5. That adequate utilities, access roads, drainage and other facilities have been or are being provided.
>
> 6. That adequate measures have been or will be taken to provide sufficient off-street parking and loading space to serve the proposed use if these measures are applicable.
>
> 7. That adequate measures have been or will be taken to prevent or control offensive odor, fumes, dust, noise and vibration, so that none of these will constitute a nuisance if these measures are applicable.
>
> 8. The use or development conforms with the County and Township Comprehensive plan.
>
> 9. The use or development is compatible with the land uses in the neighborhood.
>
> 10. A public hearing was held * * *.

Ordinance § 12.05013C. Ordinance section 12.05011, subp. 2, required Yang to submit an operational plan describing the number of employees and hours of operation, use of new and existing structures, water service, sewage disposal, area and capacity of parking areas, and access, storage, and operational areas.

The Carver County Planning and Zoning Commission held three public hearings on Yang's application. At the first, the commission staff presented a report that

included analyses of the proposed use by the Minnesota Department of Health, the Minnesota Board of Animal Health, and the Minnesota Department of Agriculture. The report expressed concerns with the adequacy of the slaughterhouse's water supply, composting plan, rendering provisions, and compliance with state bio-security measures. The commission also heard public comment from Hollywood Township residents who opposed the application on the grounds that the slaughterhouse would diminish local property values, cause pollution and noise, and create excessive traffic on the gravel township road serving Yang's property.

After the first commission meeting, the Hollywood Township board met and voted to recommend denial of the application to the Carver County Board of Commissioners. The recommendation was based solely on concerns expressed by Hollywood Township residents at the meeting that the slaughterhouse would create excess traffic and disturb its neighbors.

At the second commission meeting, the staff used Yang's estimate of ten daily customers to predict 50 daily road uses associated with the slaughterhouse, or 25% of the gravel road's capacity of 200 daily uses established by the comprehensive plan. *See* Carver County Comprehensive Plan, General Development Policy 18 (1991) (providing capacity of township gravel road is typically 200 average daily trips). The report concluded that traffic generated by the slaughterhouse appeared to prevent it from meeting the ordinance's definition of a farm-related business and from complying with the Carver County comprehensive plan. *See* Ordinance § 3.0305(C) (providing proposed activity is not a farm-related, permitted conditional use if its demand for road services cannot be accommodated "within the context of the service levels available in the commercial agricultural area"); Carver County Comprehensive Plan, Policy 16C, § 2 (providing proposed use may not comply with comprehensive plan if "substantial percentage of the road capacity will be used by the proposed activity").

The report also stated that because the application did not limit the number of customers, animal units to be processed weekly, or hours of operation, the operation could be injurious to the use of nearby property, be detrimental to the health, safety, and welfare of county residents, and create a nuisance, thereby violating Ordinance conditional use permit criteria 2, 4, and 7. Several Hollywood Township residents spoke to reiterate concerns raised in public comments at the first commission hearing.

Following the second planning commission meeting, Yang submitted an amended operational plan stating the slaughterhouse would process no more than 20 animal units in any five-day workweek, during which time he expected to attract a maximum of 50 customers. Based on his prior experience operating a slaughterhouse, Yang estimated that even with 50 weekly customers, the slaughterhouse would generate approximately 112 weekly trips, less than 10% of the road's 1400 trip weekly capacity. The amended plan included a map showing the Yang property is located approximately ¼ mile south of a highway and that highway traffic accessing the slaughterhouse via the gravel road would pass one other residence and a steel scrapyard, whose gravel-road ingress is regularly used by 18–wheel trucks. The amended plan further stated Yang would contract with rendering services for hide disposal, would work with Hollywood Township to provide dust control, and would purchase liability insurance.

After the third hearing, the planning commission voted to recommend denial of

the application to the board of commissioners after finding that the slaughterhouse's traffic and weekend operating intensity were excessive and that Yang's operational plan was inadequate.

The board of commissioners voted to deny the application after a public hearing. In its order, which adopted all of the planning commission's findings, the board found that the slaughterhouse would generate excessive traffic, that the intensity of the operation on weekends would interfere with neighbors' use and enjoyment of their property, and that Yang's operational plan inadequately described provisions taken for the slaughterhouse's water service, sewage and wastewater disposal, parking, sanitary facilities, rendering services, and livestock delivery. Yang challenges the denial.

## ISSUES

1. Was the county's denial of the conditional use permit application unreasonable, arbitrary, or capricious?

2. Was the county's denial of the conditional use permit application motivated by discriminatory intent?

## ANALYSIS

■ This court will uphold a county's decision to approve or deny a conditional use permit unless our independent review of the record determines the decision was arbitrary, capricious, or unreasonable. *Schwardt v. County of Watonwan,* 656 N.W.2d 383, 386 (Minn.2003); *see also SuperAmerica Group, Inc. v. City of Little Canada,* 539 N.W.2d 264, 266 (Minn.App. 1995) (stating conditional use permit denial will be disturbed only where it has "no rational basis") (citation omitted), *review denied* (Minn. Jan. 5, 1996).

■ A county's denial of a conditional use permit is arbitrary where the applicant establishes that all of the standards specified by the zoning ordinance as conditions of granting the permit have been met. *Zylka v. City of Crystal,* 283 Minn. 192, 196, 167 N.W.2d 45, 49 (Minn.1969). A zoning ordinance should be construed according to its plain and ordinary meaning and in favor of the property owner. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608–09 (Minn. 1980). If the ordinance expressly authorizes the proposed use, the county may only deny the conditional use permit "for reasons relating to public health, safety, and general welfare." *C.R. Investments, Inc. v. Village of Shoreview,* 304 N.W.2d 320, 324 (Minn.1981).

■ The permit applicant has the burden of persuading this court that the reasons for the denial either are legally insufficient or had no factual basis in the record. *Hubbard Broadcasting, Inc. v. City of Afton,* 323 N.W.2d 757, 763 (Minn. 1982). Yang faces a lighter burden than if he were challenging a conditional use permit approval. *See Schwardt,* 656 N.W.2d at 389 n. 4 (stating conditional use permit denials are held to less deferential standard of review than conditional use permit approvals).

1. Yang argues the county's denial of his application was arbitrary because he met all the standards specified by the ordinance for conditional use permit approval and because the reasons given by the board of commissioners for the denial had no factual basis in the record. We agree.

■ The board of commissioners based its denial largely upon findings that the slaughterhouse would generate excessive traffic on the gravel township road accessing Yang's property. The county argues these findings are substantiated by (1) "prior traffic statistics maintained by the planning and zoning office"; (2) the Holly-

wood Township board's "evaluation" of traffic on the gravel road serving Yang's property; and (3) public comment that the slaughterhouse would generate excessive amounts of traffic.

The record indicates the planning and zoning commission's traffic estimates were derived solely from daily road-use estimates provided by Yang himself in his operational plan and augmented by the commission staff on the grounds that Yang repeatedly "appear[ed] to" understate or underestimate the operation's intensity, hours of operation, and delivery and service visits. The planning commission's traffic estimates, as adopted by the board of commissioners, are not substantiated by independent analysis or reliable facts in the record. Rather, the estimates represent speculative predictions on how traffic will impact future residents of currently unplanned homes on undeveloped neighborhood property, the possible frequency of service and delivery visits, the possible maximum number of customers the operation will attract, and the potential intensity of the operation. The board's order provides no explanation for rejecting Yang's figures or crediting its own figures other than to repeatedly state Yang's estimates appear unreasonable, unrealistic, and inaccurate.

In his amended application, Yang presented evidence, including detailed analyses of customer purchasing patterns based upon his experience operating a custom slaughterhouse, that (1) the slaughterhouse, when processing its maximum 20 animal units weekly for 50 customers, would account for 112 one-way trips on the gravel road each week, or less than 10% of the road's 1400–trip weekly capacity; (2) traffic accessing the slaughterhouse would use only the one-quarter mile section of the road between the highway and the Yang driveway and would consist of passenger cars and delivery trucks; and (3) the sole residence between his property and the highway was located adjacent to a conditional use permit-authorized steel processing center regularly accessed by 18 wheel trucks that use the gravel road. The board has not substantiated its rejection of this evidence. We further note that even the board's own traffic figures predict the slaughterhouse would generate a maximum of 140 trips a week, which is 10% of the gravel road's capacity.

█ The board of commissioners also based its traffic findings on the Hollywood Township board's recommendation that the application be denied because of traffic concerns. The record is clear the Hollywood Township board's recommendation was based wholly on public comment opposing the application. The recommendation cannot therefore substantiate the board of commissioners' findings relative to traffic.

█ The county next argues the board's traffic findings were legitimately based upon public comment. A city may consider neighborhood opposition only if based on concrete information. *Scott County Lumber Co. v. City of Shakopee,* 417 N.W.2d 721, 728 (Minn.App.1988), *review denied* (Minn. Mar. 23.1988); *see also Swanson v. City of Bloomington,* 421 N.W.2d 307, 313 (Minn.1988) (acknowledging city may consider neighborhood opposition). In representative statements before the commission and the board, town residents stated the Yang farm appeared to be holding "a great big party [with] many, many cars" every weekend and that Yang appeared to be having "big parties [with] ten to 14 cars going in;" one neighbor reported his mother saw "ten cars coming down the road at 10:00 at night."

As area residents, the neighbors have sufficient "competency and personal knowledge" to discuss traffic congestion.

*See Corwine v. Crow Wing County,* 309 Minn. 345, 361, 244 N.W.2d 482, 491 (1976). But the neighbors' anecdotal comments contain no detail as to how the cars they witnessed might affect circulation or the general welfare, and are insufficiently concrete to substantiate a finding that the proposed use would create excess traffic. *Cf. SuperAmerica,* 539 N.W.2d at 268 (upholding denial of a conditional use permit based on traffic concerns where "witnesses spoke of existing, daily traffic problems" and gave specific examples of "current congestion"). The neighbors' comments here are insufficient to substantiate a finding that Yang's slaughterhouse will cause excessive traffic.

We can find no basis in the record for the board's conclusions that traffic generated by the slaughterhouse will create an excessive demand on the gravel road or use a disproportionate share of the road's capacity. We therefore hold the board acted arbitrarily in concluding that excessive traffic generated by the proposed use was a valid reason to deny Yang's application. *See C.R. Investments, Inc.,* 304 N.W.2d at 325–28 (overturning conditional use permit denial where no concrete evidence warranted an inference that the proposed use would substantially aggravate traffic); *Minnetonka Congregation of Jehovah's Witnesses, Inc. v. Svee,* 303 Minn. 79, 85, 226 N.W.2d 306, 309 (1975) (holding that unsubstantiated speculation about increased traffic does not support denial of a conditional use permit application).

■ The board also found that Yang's application understated or underestimated the overall intensity of the slaughterhouse and that the actual intensity of the operation, particularly on weekends, will interfere with the neighbors' recreational enjoyment of their property. Although the board does not define "intensity," the term is used in reference to the number of trips made to the slaughterhouse by service and customer vehicles, the number of employee hours worked on a given day, and the number of animal units slaughtered on a given day.

We conclude the findings related to intensity are not substantiated by evidence in the record. First, the board provides no independent analysis or statistics in support of its decision to reject Yang's intensity estimates as unrealistic underestimates of actual operating levels or its decision to replace Yang's figures with its own augmented figures. Second, the board provides no explanation for its decision to characterize both Friday and Saturday as weekend days in its finding that intense weekend slaughter will interfere with neighbors' enjoyment of their properties. We further note that although Yang's initial operating plan included Sunday operation, he agreed to remain closed on Sundays at the request of neighbors. Third, the findings do not establish a causal link between the intensity of the operation and the degree of disturbance the operation will cause, or explain why a slaughterhouse is disruptive in an agricultural district containing feedlots and an adjacent steel scrapyard.

In addition to the board's own estimates, the record evidence supporting the intensity findings consists of public comment stating that the operation will generate noise and traffic or that it might have a detrimental effect on the environment and local property values. This speculative comment does not provide a factual basis for the findings. *See id.* at 85, 226 N.W.2d at 309 (holding that where the controlling ordinance specifically provides for proposed use, general objections to granting conditional use permit are not competent evidence to support denial); *see also C.R. Investments., Inc.,* 304 N.W.2d at 325 (stating that neighbors' objections to con-

ditional use permit application must be based on more than conjecture or speculation). We conclude the board's findings concerning the slaughterhouse's expected intensity lack a reliable basis in the record and cannot justify denying Yang's application.

The board of commissioners also found Yang's operational plan failed to adequately describe provisions taken to comply with state regulations concerning water service, sewage and wastewater disposal, parking, sanitation facilities, rendering, and livestock delivery at the slaughterhouse. The record shows that Yang's initial and amended operational plans described the proposed use's on-site sewer services and water well, plans to build two new bathrooms, waste management provisions, rendering contracts, wastewater disposal, water quality testing, and parking.

In his operational plans and at the public hearings, Yang recognized that he cannot operate his slaughterhouse until he complies with all applicable state regulations and obtains the relevant licenses, and suggested that the board condition issuance of the conditional use permit on his obtaining the licenses. The board of commissioners' findings contain the Minnesota Board of Animal Health's recommendation that approval of the application be conditioned on Yang's compliance with state rendering, composting, and biosecurity measures. The findings also contain the Minnesota Department of Agriculture's statement that it will not license the slaughterhouse until Yang obtains the conditional use permit.

The county requires that a proposed use comply with all applicable regulatory requirements before a conditional use permit will issue, and may condition issuance on compliance as verified by the relevant agency. *See* Ordinance conditional use permit requirement 1. But specific state licensing standards concerning water service, sewage and wastewater disposal, sanitary facilities, livestock delivery, and rendering services are not established by the board of commissioners or the ordinance, and it is not the board's responsibility, under the ordinance, to enforce compliance with these standards.

Where state standards are set and enforced by state agencies and where a conditional use permit applicant informs the board of commissioners of his intention to comply with all applicable standards, the board need not resolve specific compliance issues prior to granting a conditional use permit. *See Schwardt,* 656 N.W.2d at 388–89 (holding that county board of commissioners may not deny conditional use permit application on grounds proposed use does not comply with county setback requirement where it was zoning administrator's duty to enforce the setback requirement and where applicant promises that he will comply with requirement). The board of commissioners had no duty to ensure state regulations were met, and should have reserved the question of regulatory compliance for the relevant state agencies by conditioning issuance of the conditional use permit on Yang's confirmed compliance with state standards. *See id.* We therefore hold that the county acted arbitrarily in denying Yang's application on the grounds that his operational plan inadequately described his compliance with state standards.

In its final finding, the board of commissioners states that the proposed "operation [does] not look farm related and [looks] more like a commercial-industrial business" because Yang intends to raise 30% of his animals on-site "and [have] the rest imported." This finding is not supported by the record or by the plain mean-

ing of the ordinance, which provides that a farm-related business must involve "sales and/or purchasing of products of the local agricultural economy or of goods unique and necessary to agricultural operations." Ordinance § 3.0305A 3. In the record, Yang repeatedly states that any animals he purchases will come from local producers and local auction houses. We do not agree with the board's finding that these animals are not "products of the local economy" or that locally purchased animals are "imported" and preclude defining the slaughterhouse as a farm-related business. The county cites to no support in the ordinance for its conclusion that Yang's operation is commercial-industrial for the fact that it does not raise all of its own animals for slaughter.

Construing the ordinance according to its plain and ordinary meaning and in favor of the property owner, we hold that Yang's application met all the conditions specified by the ordinance for conditional use permit approval. Yang's request is for a farm-related business, which is a permitted conditional use consistent with the comprehensive plan. There is inadequate evidence in the record in support of the county's position that such use would diminish the use or enjoyment of the surrounding property, impair the health, safety, or welfare of local residents, impede the use or development of the surrounding vacant property, or excessively burden available services, including roads.

We conclude that the county did not have a legally sufficient reason to deny the permit. "[W]hen a governmental body denies a permit with such insufficient evidence that the decision is arbitrary and capricious," the general principle is that the appellate court should order issuance of the permit. *Interstate Power Co., Inc. v. Nobles County Bd. of Comm'rs*, 617 N.W.2d 566, 577 (Minn.2000) (quotation omitted). We therefore reverse the decision of the county board and remand with directions that the county issue the permit, subject to reasonable conditions.

2. Because we hold that the county acted arbitrarily in denying Yang's application, we do not address Yang's assertion that the denial was motivated by purposeful discrimination based on his race or ethnicity. We note, however, that our careful review of the record reveals no evidence of such discrimination by the county.

### DECISION

Because the record does not support the county's denial of the conditional use permit, we reverse the county's decision and remand with directions that the county issue the permit, subject to reasonable conditions.

**Reversed and remanded.**