*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2162**

David Vigstol, et al.,
Relators,

vs.

Isanti County Board of Commissioners,
Respondent.

**Filed December 8, 2014
Reversed and remanded
Larkin, Judge**

Isanti County Board of Commissioners

Paula A. Callies, Callies Law, PLLC, Minneapolis, Minnesota (for relators)

Paul D. Reuvers, Nathan C. Midolo, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent)

        Considered and decided by Hudson, Presiding Judge; Larkin, Judge; and Stoneburner, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**LARKIN**, Judge

Relators challenge respondent county board of commissioners' denial of their request for a conditional use permit. Because the board's decision was unreasonable, we reverse and remand for respondent to grant the permit as proposed.

**FACTS**

In July 2013, Isanti County amended its zoning ordinance to allow "rural retail tourism businesses" as conditional uses in "agriculture/residential" districts. Isanti County, Minn., Zoning Ordinance (ICZO) § 6, subd. 3.22 (2013). The ordinance describes "rural retail tourism businesses" as businesses that "attract travelers or visitors to areas historically or traditionally used for agricultural purposes, which are generally small-scale, low impact, and entertainment, recreation, and/or education focused." *Id.* To obtain a conditional use permit (CUP), including one for a rural retail tourism business, a landowner must submit an application to the zoning administrator, and the county planning commission holds a public hearing on the application and reports its findings and recommendations to the board of county commissioners. ICZO § 18, subds. 1.1, 1.3, 2, 3 (2013). The board then holds "whatever public hearings it deems advisable" and decides whether to grant or deny the CUP. *Id.*, subd. 3.

Relators David and Susan Vigstol applied for a CUP for a rural retail tourism business the day the zoning ordinance was amended. The Vigstols own about 20 acres of land in North Branch. Their property is located on a county road in an

agriculture/residential district. They have neighbors to the north, northwest, and west, a county park to the south, and a campground nearby.

The Vigstols stated in their CUP application that they planned to open The Meadow at Anderson Farm, "a country venue to host various groups of people for wedding ceremonies & receptions, family reunions, [and] civic group gatherings." The venue would operate on the Vigstols' property from mid-May to mid-October and accommodate up to 250 guests per event. The Vigstols planned to install an antique barn and construct an 85-car parking lot. Their proposed business hours were 11 a.m. to 8 p.m. on Sundays, Wednesdays, and Thursdays, and 11 a.m. to 11:30 p.m. on Fridays and Saturdays, with the venue available for weddings during eight-hour periods on weekends.

On August 8, the Isanti County Planning Commission heard comments on the Vigstols' application. Six neighbors stated that they opposed the permit request based on concerns regarding noise, traffic, parking, alcohol consumption, and litter, and one neighbor presented a petition signed by 32 persons who shared those concerns. The planning commission discussed "at length" whether the Vigstols' proposal was "small scale and/or low impact," noting that it had "not heard of a way for this activity to be mitigated for sound." One commission member specified that he was concerned about whether the property is adequately screened or separated "to prevent undue negative impact to nearby properties," whether the business will cause a "traffic hazard or undue congestion," and whether the business will "negatively impact the neighborhood by intrusion of noise, glare, odor or other adverse effects." The commission member stated that "noise is definitely a concern" because "music will be amplified indoors and there

has been no mitigation of this from the barn," which "will not be closed up." The commission voted unanimously to table the Vigstols' request until a later date so more information could be provided.

The Vigstols submitted a revised CUP application. They lowered the number of expected guests to 150, reduced the parking lot size to 50 cars, and limited their business hours to appointments only, with events scheduled during eight-hour periods between 8 a.m. and 11 p.m. and no business on Sundays. To address noise and lighting concerns, they stated that they would move the barn farther from property lines, insulate it, and install heating and air conditioning. They said that they would turn down any music to a "conversational level" by 10 p.m. and require all guests to leave before 11 p.m. All lighting would be "down light . . . aimed away from neighbors" that would turn off automatically at 11:30 p.m., and the parking lot would be screened with an "arborvitae hedge." They also planned to plant trees and build sheds to shield neighboring properties.

The Vigstols stated that they would pursue renting the venue year-round to recover the noise-control costs, although the primary season would still be May to October. Referring to papers from the Arbor Day Foundation and the Minnesota Pollution Control Agency, they explained how the trees and building materials they planned to use would reduce the decibel level at their property line to between "bedroom noise" and "a quiet forest." They also submitted a "limited data set" based on their observations of cars that passed their house during various periods. They estimated having 40 or 50 vehicles per wedding and stated that this "is not likely to cause a traffic issue" because the vehicles

4

"would not come or leave in a caravan," all parking would be off-street, and traffic directions would be provided. They also stated that they would "support requests for beer and wine only" and hire staff "trained to recognize a person who has had too much to drink," as well as an off-duty police officer.

At the next planning commission hearing, David Vigstol advocated for the amended application, and several neighbors voiced their opinions both for and against it. The planning commission voted 5-3 to recommend approving the request with the following conditions:

> 1. The hours of operation will be Monday – Thursday 8:00a.m. – 7:00p.m. and Friday – Saturday 8:00a.m. – 11:00p.m. with the music ending by 10:00p.m. with no Sundays.
> 2. This conditional use permit must be reviewed yearly [and] can be modified.
> 3. One wedding event (wedding ceremony and/or reception) per weekend; either Friday or Saturday with no events on Sunday.
> 4. The light poles to be installed as described in the plan submitted by Mr. Vigstol with the lights pointing downwards from traffic and/or neighboring properties.
> 5. Must not have any outdoor music amplification.
> 6. Must follow the recommendations of the Isanti County Highway Department.
> 7. No on street parking.
> 8. No paper lanterns and/or fireworks on site and no celebratory honking.
> 9. Owner and/or family member must be on the premises at all times during every event.
> 10. No mixed drinks and/or liquor; only beer or wine.
> 11. Staff must be trained and an off duty contracted police officer [must be] on site while liquor is being served.
> 12. The plantings will be a minimum of a row of 5' Pine Trees with 30' spacing and 15' row separation to the row

of 5' Spruce Trees with 15' spacing for screening on the north property line.

13. The barn and bathrooms must be built to year round climate control with STC 40 minimum with windows and doors that seal tight.

14. Must meet all building and septic codes.

15. Must meet all State and Local codes.

16. Up to 150 people total on site.

17. Must have class 5 or better for the parking lot and driveway.

18. A portion of the house may be allowed to be used for the wedding party to prepare for the ceremony on the day of the ceremony.

19. No outside weddings that are [inherently] noise generating.

20. Outdoor garbage cans must be covered to control the debris.

The commission also made ten findings to support its recommendation, one of which is that the "Highway Department will be requiring a turn lane so that this will not cause traffic hazard or undue congestion."

During the next few days, Isanti County commissioners received ten e-mails regarding the Vigstols' application. Eight opposed the request, one favored it, and one from David Vigstol linked to local news stories about the antique barn the Vigstols had purchased. The e-mails opposing the request described concerns about "the added noise, traffic, and congestion this business will bring to our area," the need to add a turn lane to the county road, taxpayer money spent on enforcing the CUP, and diminished property values. They also indicated the senders' opinions that the Vigstols' proposal does not meet ordinance requirements, particularly the "small scale" and "low impact" standards. Two of the e-mails referred to a petition with more than 60 signatures "from owners of 34 properties within one mile of [the Vigstols] that are totally against approval." The e-mail

6

in favor of the request was from the Vigstols' "closest" neighbors, who live "directly across the street" and stated that they "feel like there will be NO impact on [their] lives with this business" and are "100% in favor of this proposal."

At respondent Isanti County Board of Commissioners' October 16 meeting, the board heard comments about the Vigstols' application from eight persons, including David and Sue Vigstol. The comments were limited to one minute per person. The board then discussed the Vigstols' request. While reviewing the planning commission's conditions, the county administrator stated that he had recently spoken to Richard Heilman, the county highway engineer. He stated that Heilman "looked at [the Vigstols' property] this week" and "doesn't feel that the right-turn lane is required for 50 cars." He added, "If it would grow, [Heilman] would look at it again. But at this point he's saying that isn't a requirement. So one of the findings referred to that. We'll have to change that." Later, when reciting the planning commission's finding that the highway department will require a turn lane, the speaker stated, "[T]his is where we need to change that. They will meet Highway Department regulations regarding this. So it will not cause a traffic hazard or undo congestion."

County Board Chairperson Susan Morris, who was also a member of the planning commission, then reviewed the background of the Vigstols' CUP request. She stated that she had spoken to a real estate agent and asked whether the Vigstols' proposal would decrease the neighbors' property values. She said that the real estate agent "laughed" and responded "absolutely not." Morris added, "[T]hey have done multiple studies that this type of venue and churches [do] not affect the value of people's homes. There is no

7

proof, is what the studies have said." Morris expressed her concern that the CUP could pass to anyone who bought the Vigstols' property, and the board discussed how including an annual-review condition would resolve that issue. She also clarified that the Vigstols would be allowed to host a rehearsal dinner the night before a wedding, despite the limit of one "wedding event" per weekend.

Morris addressed the audience and said, "I promise you that going forward, we will put setbacks in the ordinance for businesses that will have a higher . . . impact. We will revisit the ordinance. We can't change the rules now on somebody who [has] already applied though." She added, "Our ordinance does allow this and I know that Dave and Sue will do an excellent job running this business." She then moved to approve the Vigstols' request with the planning commission's findings.

The commissioners discussed the proposed CUP and voted 4-1 against Morris's motion to approve it. Later, another commission member moved to deny the Vigstols' proposed CUP with the following proposed findings:

> [T]he impacts on Anderson Park on after hours. Also it's not, in my view, a small scale operation. That anticipated 150 people and with the ordinance the way it's written, I don't believe that's small scale.
> Also the site is a little bit small, a little bit for the type of operation they are going to have, and I think that's a negative impact on the safety and the health of the area. There is no setback with it. So it would be right up on that main road. Also that would be the traffic safety issue.
> And now there is also question about whether or not a turn lane has to be put in.

The motion to deny carried with four votes in its favor.

The board sent the Vigstols a letter informing them of its decision. The letter included the following findings:

> 1. The proposal will likely have a negative impact on Anderson Park, in light of the fact that the proposed facility is adjacent to the park, and the fact that the proposed project contemplates evening events.
> 2. The proposal is not a small-scale, low-impact operation. The ordinance only permits small-scale, low-impact operations that will not, for example, negatively impact their neighborhood by intrusion of noise or through other adverse effects.
> 3. The parcel where this operation is proposed is too small for the type of operation proposed. Additional space would potentially have limited the impact of the noise and activity on surrounding neighbors.
> 4. The proposed setbacks of the primary facilities described in the proposal from the surrounding property lines were not adequate in light of the level of activity contemplated.
> 5. There is a possibility that increased traffic attracted to the site would create a hazard.

This certiorari appeal follows.

## D E C I S I O N

A county zoning authority's CUP decision is quasi-judicial and reviewable by writ of certiorari. *Big Lake Ass'n v. St. Louis Cnty. Planning Comm'n*, 761 N.W.2d 487, 490 (Minn. 2009). Appellate review is limited to the "facts and circumstances developed before" the body that made the decision. *Id.* at 491 (quotation omitted). Caselaw expresses the standard of review for zoning matters in various ways: "Is there a 'reasonable basis' for the decision? or is the decision 'unreasonable, arbitrary, or capricious'? or is the decision 'reasonably debatable'?" *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 417 (Minn. 1981). But the question is always "whether the zoning

9

authority's action was reasonable." *Id.* at 416-17. Our review is deferential because "counties have wide latitude in making decisions about special use permits." *Schwardt v. Cnty. of Watonwan*, 656 N.W.2d 383, 386 (Minn. 2003). But a landowner whose permit request was denied "faces a lighter burden than if he were challenging a conditional use permit approval." *Yang v. Cnty. of Carver*, 660 N.W.2d 828, 832 (Minn. App. 2003).

The zoning authority "must articulate the reasons for its ultimate decision, with specific reference to relevant provisions of its zoning ordinance." *Earthburners, Inc. v. Cnty. of Carlton*, 513 N.W.2d 460, 463 (Minn. 1994). If it chooses to deny a CUP request, it "must articulate [its] specific basis for the denial, i.e., an explanation of the applicant's failure to satisfy the ordinance criteria." *Id.* "Along with a clearly articulated rationale for its decision, specific reference to the local ordinance is essential to facilitate effective judicial review." *Id.*

When reasons are given for a CUP decision, we "assess the legal sufficiency of the reasons" and "determine whether, if legally sufficient, they had a factual basis." *C. R. Invs., Inc. v. Vill. of Shoreview*, 304 N.W.2d 320, 325 (Minn. 1981). We will uphold a decision if the zoning authority's findings are "supported by the evidence and provide[] a rational basis for the municipal decision." *Swanson v. City of Bloomington*, 421 N.W.2d 307, 314 (Minn. 1988). A permit denial is not unreasonable "when at least one of the reasons given for the denial satisfies the rational basis test." *Trisko v. City of Waite Park*, 566 N.W.2d 349, 352 (Minn. App. 1997), *review denied* (Minn. Sept. 25, 1997). The party challenging the decision has the burden of persuasion. *Hubbard Broad., Inc. v. City of Afton*, 323 N.W.2d 757, 763 (Minn. 1982).

The Isanti County Zoning Ordinance sets forth two requirements for a rural retail tourism business. ICZO § 14, subd. 12.B (2013). First, the business must obtain a CUP. *Id.*, subd. 12.B.1. Before a CUP is issued, the planning commission must find:

> 1. That the conditional use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purpose already permitted, nor substantially diminish and impair property values within the immediate vicinity.
> 2. That the establishment of the conditional use will not impede the normal and orderly development and improvement of surrounding vacant property for uses predominant in the area.
> 3. That adequate utilities, access roads, drainage and other necessary facilities have been or are being provided.
> 4. That adequate measures have been or will be taken to provide sufficient off-street parking and loading space to serve the proposed use.
> 5. That adequate measures have been or will be taken to prevent or control offensive odors, fumes, dust, noise, and vibration so that none of these will constitute a nuisance, and to control lighted signs and other lights in such a manner that no disturbance to neighboring properties will result.

ICZO § 18, subd. 4 (2013). The second requirement is that the business must "have a unique and demonstrable relationship with Isanti County or its region, and its history, culture, traditions, arts, crafts, lore, natural resources, or other features and amenities, in accordance with the above stated purposes." ICZO § 14, subd. 12.B.2.

The ordinance identifies several "allowed uses" for rural retail tourism businesses, including "single family residential rental properties for retreats, crafting, weddings, receptions, bed & breakfasts, wineries, craft breweries and distilleries, small-scale, low

11

impact special events or music festivals." *Id.*, subd. 12.C (2013). "Small-scale" and "low-impact" refer to land uses that:

> 1.    Do not create an excessive demand upon existing services or amenities;
> 2.    Are screened or able to be screened adequately, or are sufficiently separated from adjacent development or land, to prevent undue negative impact to nearby properties;
> 3.    Will not have an appearance that is inconsistent or incompatible with the surrounding area;
> 4.    Will not cause traffic hazard or undue congestion; [and]
> 5.    Will not negatively impact the neighborhood by intrusion of noise, glare, odor or other adverse effects.

*Id.*, subd. 12.D (2013).

The Vigstols argue that the board's decision "was arbitrary, capricious, and unreasonable" because their proposal met the ordinance requirements, the board impermissibly relied on general public opposition, and the board's reasons for its denial are legally insufficient and not supported by the record. We consider each of the board's five findings in turn.

The board's first finding is that the Vigstols' "proposal will likely have a negative impact on Anderson Park, in light of the fact that the proposed facility is adjacent to the park, and the fact that the proposed project contemplates evening events." The board did not specify the ordinance provision to which this finding applies, but both the CUP and the rural retail tourism business standards prohibit uses that negatively impact the surrounding land. ICZO §§ 14, subd. 12.D; 18, subd. 4.1. This finding therefore has a legal basis, but it must have factual support as well.

12

The record establishes that Anderson Park is adjacent to the Vigstols' southern property line and is "set up for hiking" and other wilderness activities. But there is no explanation of how granting the Vigstols' CUP request would affect the park. The park director said that his "only concern" is "the after hours unintended use of the park." A neighbor stated that the Vigstols' property is "not screened at all" from the park. One commission member "[thought] that [granting the request] would have an effect on" the park and noted the absence of comments from the Friends of Anderson Park. These statements are merely speculative concerns, not based on any specific facts. *See C. R. Invs., Inc.*, 304 N.W.2d at 325 ("[W]e are required to conclude that [the commission's] stated reasons do not have factual support in the vague reservations expressed by either the single-family owners or the commission members."). The Vigstols' proposal and the planning commission's conditions specifically addressed concerns about excessive noise and inadequate screening. The board did not find these plans inadequate; it simply stated that the park would "likely" be negatively impacted because the Vigstols' proposal "contemplates evening events" without offering any further explanation. Because there is an insufficient factual basis, the board's first finding does not support denial of the CUP.

The board's second finding is that the Vigstols' proposal "is not a small-scale, low-impact operation." The board stated that "[t]he ordinance only permits small-scale, low-impact operations that will not, for example, negatively impact their neighborhood by intrusion of noise or other adverse effects." "Small-scale" and "low-impact" are explicit requirements for rural retail tourism businesses. ICZO § 14, subd. 12.D. Accordingly, this could be a legally sufficient reason to deny the request. But the board

did not cite or identify any factual support for its conclusion. It simply recited one of the five small-scale, low-impact requirements. *See* ICZO § 14, subd. 12.D.5. Because the board did not explain why it found that the Vigstols' proposal is not small scale or low impact, this finding is inadequate. *See Honn*, 313 N.W.2d at 416 (stating that the reasons for a decision must be expressed in "more than just a conclusory fashion").

Many of the e-mails to commissioners offered neighbors' opinions that the Vigstols' proposal is not small scale or low impact. Opponents who spoke at the hearing expressed similar views. "Although neighborhood sentiment may be taken into consideration in any zoning decision, it may not constitute the sole basis for granting or denying a given permit." *Nw. Coll. v. City of Arden Hills*, 281 N.W.2d 865, 869 (Minn. 1979). "[T]he simple fact that community members oppose a landowner using his land for a particular purpose is not a legally sufficient reason for denying a special-use permit." *Barton Contracting Co., Inc. v. City of Afton*, 268 N.W.2d 712, 718 (Minn. 1978). Accordingly, even though some neighbors clearly opposed the Vigstols' request and offered their opinions that the proposal does not meet ordinance requirements, their statements cannot support the board's decision because they are conclusory and not based on concrete information. *See C. R. Invs., Inc.*, 304 N.W.2d at 325 ("[V]ague reservations expressed by either the single-family owners or the commission members" cannot factually support stated reasons for denying a permit.); *Yang,* 660 N.W.2d at 833 ("A city may consider neighborhood opposition only if based on concrete information.").

Notably, one small-scale and low-impact requirement is that the use will not cause "undue negative impact to nearby properties." ICZO § 14, subd. 12.D.2. Two neighbors

testified that they had spoken to realtors who said that their property values would go down 10 to 15% if the Vigstols opened their venue. Despite Chairperson Morris's statement that another real estate agent had said property values would not be affected, the neighbors' statements indicate a possible "undue negative impact to nearby properties." But the board did not cite decreased property values as a reason to deny the Vigstols' proposed CUP.

The board's third finding is that the "parcel where this operation is proposed is too small for the type of operation proposed. Additional space would potentially have limited the impact of noise and activity on surrounding neighbors." Another small-scale and low-impact requirement is that the use "[w]ill not negatively impact the neighborhood by intrusion of noise, glare, odor or other adverse effects." ICZO § 14, subd. 12.D.5. But there are no specific size requirements for rural retail tourism businesses, and the planning commission's conditions required the Vigstols to meet all building, septic, state, and local codes. Furthermore, neither the board nor the record explains why the size of the Vigstols' property would foster intrusive noise levels. The Vigstols presented a detailed plan showing how landscaping and buildings would reduce the decibel level of events. Except for one e-mail from a woman who stated that she can hear her neighbor "having a conversation when he is inside his polebarn and he is over 10 acres away through 2 lines of mature trees," no one refuted the viability of the Vigstols' noise-reduction plans with concrete information. Thus, the board's third finding lacks both a legal and factual basis.

15

The board's fourth finding is that the "setbacks of the primary facilities described in the proposal from the surrounding property lines were not adequate in light of the level of activity contemplated." As with the board's concerns about the parcel size, this finding lacks legal support. The rural retail tourism business provisions contain no setback requirements, the Vigstols would be required to meet all existing building codes as a condition of receiving the permit, and the record does not contain any evidence that the Vigstols' proposal would violate any existing setback requirements. Accordingly, the board's finding that the Vigstols' setbacks "were not adequate" lacks legal and factual support.

The board's fifth finding is that "[t]here is a possibility that increased traffic attracted to the site would create a hazard." Traffic hazards and congestion are valid reasons to deny a CUP request. ICZO § 14, subd. 12.D.4. But the board did not find that the Vigstols' proposal would actually affect traffic; it merely stated that a "possibility" exists.

A zoning authority "must have some basis for finding that a traffic problem would exist." *Minnetonka Congregation of Jehovah's Witnesses, Inc. v. Svee*, 303 Minn. 79, 85, 226 N.W.2d 306, 309 (1975). As the supreme court stated in a similar context, "It is self-evident that any church will cause heavier vehicular traffic, but for that matter, so would residential construction. However, that is far from the creation of a traffic hazard." *Id.*; *see also Yang*, 660 N.W.2d at 833 (rejecting board's traffic estimates because they were "speculative predictions" and "not substantiated by independent analysis or reliable facts in the record"). Here, all the concerns about traffic were speculative. The county

16

administrator indicated that the highway department would *not* require a turn lane for 50 cars, the high end of the Vigstols' estimated number of vehicles coming to the venue. The commission member who moved to deny the Vigstols' request also recognized this change by stating that "there is a question about whether or not a turn lane has to be put in." In sum, the board's fifth finding is inadequate to support the CUP denial.

Because the board's reasons for denying the proposed CUP lack a sufficient legal and factual basis, the decision was unreasonable. We therefore reverse. "[W]hen a governmental body denies a permit with such insufficient evidence that the decision is arbitrary and capricious, the court should order issuance of the permit." *In re Livingwood*, 594 N.W.2d 889, 895 (Minn. 1999). The Vigstols ask us to direct the county board to approve their original proposed CUP. But the board never considered the Vigstols' original proposal. The only decision that is before this court for review is the board's denial of the Vigstols' amended CUP proposal, which includes the 20 conditions imposed by the planning commission. Accordingly, we remand for the board of commissioners to grant the Vigstols' amended CUP proposal with the conditions imposed by the planning commission.

**Reversed and remanded.**