*This opinion will be unpublished and*
*may not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0464**
**A14-0481**
**A14-1224**
**A14-1225**

In re: The Application of Living Word Bible Camp for a Conditional Use Permit and Planned Unit Development Permit In Re: The Final Planned Unit Development Application of Living Word Bible Camp

**Filed April 6, 2015**
**Affirmed**
**Peterson, Judge**

Itasca County Planning Commission

James P. Peters, Law Offices of James P. Peters, PLLC, Glenwood, Minnesota (for relators)

John H. Erickson, Brainerd, Minnesota (for relator Holly Newton)

G. Craig Howse, Jeffrey C. Thompson, Jacob R. Grassel, Howse & Thompson, P.A., Plymouth, Minnesota (for respondent Living Word Bible Camp)

John J. Muhar, Itasca County Attorney, Grand Rapids, Minnesota; and

Paul D. Reuvers, Andrea B. Smith, Iverson Reuvers, Bloomington, Minnesota (for respondent Itasca County Planning Commission)

Considered and decided by Peterson, Presiding Judge; Schellhas, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**PETERSON**, Judge

In these consolidated appeals, two groups of relators who oppose respondent landowner's plan to build a youth bible camp challenge respondent county planning commission's decisions to approve a conditional-use permit, planned-unit-development permit, and final planned-unit-development permit for construction of the camp. We affirm.

## FACTS[1]

Respondent Living Word Bible Camp (LWBC) purchased approximately 283 acres of property on Deer Lake in Itasca County in 2000. LWBC intends to build a youth bible camp in a "cluster" development that encompasses fewer than six acres of the property, and the project is envisioned to include a lodge; five cabins; a storm shelter; a gazebo; activity, office, and storage buildings; parking; trails; and an additional dock. At full capacity, the camp is designed to accommodate 150 overnight guests. Approximately 84 acres of the property are subject to a conservation easement owned by the Minnesota Land Trust. The conservation easement generally prohibits development but specifically permits construction of trails for "firebreaks, walking, horseback riding, [and] cross-country skiing."

Some area residents oppose LWBC's plan to construct the camp, and, during the fourteen years since LWBC purchased the property, they have unsuccessfully challenged

---

[1] The underlying facts are set forth in prior opinions, and we recount them only to the extent necessary.

the rezoning for the project, the project's environmental efficacy, and LWBC's status as a tax-exempt entity.

LWBC applied for a conditional-use permit (CUP) and a planned-unit-development permit (PUD) in 2006, but the applications were suspended for the duration of an environmental review conducted by Itasca County (county).[2] LWBC renewed its CUP/PUD applications on October 30, 2013, and submitted to respondent Itasca County Planning Commission (commission) materials that included a property description, site and floor plans, maps, a base density analysis, the environmental-assessment worksheet (including a sanitary-sewer concept-design report), and materials from the 2006 CUP/PUD proceedings.

The commission held a public hearing on December 11 and 12, 2013, and January 8 and 29, 2014. The commission made the following finding on the intended use of the LWBC project:

> The capacity of the "Camp's" project is 150 overnight guests. The project is a Bible camp, retreat, and learning center primarily for children and ancillary for adults. Children-related uses include a summer Bible camp for third to eighth graders eight weeks during the summer, and occasional programs for home-schooled children. Uses also include staff

---

[2] Some area residents initiated an environmental review regarding their concerns about how LWBC's planned use of the property would affect the naturally occurring and environmentally sensitive muskellunge spawning area offshore, as well as Deer Lake's water quality. Ultimately, the county issued a negative declaration on the need for further environmental review, and this court affirmed, ruling that the county had properly conducted the environmental review and that there was substantial evidence to support its decision that no further environmental review was necessary. *In Re Declaring a Negative Need for an Envt'l Impact Statement for the Proposed Living Word Bible Camp Project*, Nos. A13-1153, A13-1157, 2014 WL 3557954 (Minn. App. July 21, 2014), *review denied* (Minn. Oct. 14, 2014).

3

development, marriage retreats and parenting seminars for adults. The majority of uses will take place in the summer months, but weekend retreats and off-season camps will also occur. The uses supported by the project facility are uses that are currently occurring on the lake and include: shelter, accommodations for visitors, swimming, learning, playing, studying, sports, boating, fishing, sailing, cross country skiing, campfires and other recreational activities typical to those about the lake. The "Camp" will be closed for a portion of winter months.

The commission made numerous findings that reference restrictions on LWBC's use of the property, including use of "clustering" development to build on fewer than six acres of the property with approximately 240 acres to remain in a natural state, visual and noise buffering, general construction setbacks of 200 feet from the shoreline, location of roads and parking, consideration of traffic patterns, limitations on the size and location of the beach, restrictions on the number and types of boats (no jet skis or ski boats, limit of two fishing boats and two pontoon boats and 20 kayak-type boats), restrictions on docks (three) and boat slips, an oversized sanitation system, mitigation of phosphorus and other pollutants through implementation of a stormwater-management system that complies with state and national restrictions as well as a stormwater-pollution prevention plan, a plan to minimize environmental disturbances to area wildlife through use restrictions, use of open-space covenants to preserve at least 50% of the property, vegetation clearing limits, and implementation of specific erosion-control measures during and after construction.

In its January 30, 2014 decision, the commission concluded that the CUP and PUD should issue because LWBC had complied with the relevant county ordinances.

The commissioners' decision includes a "resolution and orders" section that makes approval of the CUP and PUD subject to 32 conditions that protect the environmental and other use objectives expressed in the decision.

On February 24, 2014, LWBC submitted a final site plan, which began the review process to determine whether the commission should grant approval of the final planned-unit-development permit (FPUD). The commission received numerous documents, including an updated open-space covenant and map and final plan, and held a public meeting on March 12, April 9, and May 14, 2014. The commission implemented a checklist "to determine if the criteria for final approval under the Ordinance have been met." With reference to the pertinent ordinances, the commission considered whether the "nature, location, and physical features of the project" would comply with CUP requirements, as well as requirements and objectives related to open-space covenants and vegetation preservation, shore recreation facilities, stormwater management and erosion control, septic and water-supply systems, parking, and "other concerns and objections." The commission approved the FPUD on May 22, 2014.

Relators Pamela J. Brown and a group of 34 area residents (Brown), and relator Holly Newton (Newton) sought review of the CUP/PUD decisions in March 2014. By order of this court, the two appeals were consolidated. Brown and Newton then filed separate appeals to challenge the commission's FPUD decision in July 2014. This court consolidated the four appeals but required separate briefing on the CUP/PUD and FPUD decisions.

## DECISION

### I.
### CUP/PUD

A CUP is a protected property right that runs with the land. *Northpointe Plaza v. City of Rochester*, 465 N.W.2d 686, 689 (Minn. 1991). A county zoning authority may approve a CUP when the applicant demonstrates compliance with the "'standards and criteria stated in the ordinance.'" *Big Lake Ass'n v. St. Louis Cnty. Planning Comm'n*, 761 N.W.2d 487, 490 (Minn. 2009) (quoting Minn. Stat. § 394.301, subd. 1 (2008)). Appellate review of a quasi-judicial zoning decision "is limited to an examination of the record made by the local zoning authority." *Id.* In reviewing a zoning authority's approval of a CUP, "the reviewing court typically should confine itself at all times to the facts and circumstances developed before that body." *Id.* at 491 (quotation omitted).

> [O]ur standard of review is deferential, particularly when the local zoning authority has made the decision to approve a conditional use permit. *Schwardt v. County of Watonwan*, 656 N.W.2d 383, 389 n.4 (Minn. 2003) (noting that "[w]e have traditionally held CUP approvals to a more deferential standard of review than CUP denials"). "We review a county's decision to approve a CUP independently to see whether there was a reasonable basis for the decision, or whether the county acted unreasonably, arbitrarily, or capriciously." *Id.* at 386.

*Id.*

"A zoning ordinance should be construed according to its plain and ordinary meaning and in favor of the property owner." *Yang v. Cnty. of Carver*, 660 N.W.2d 828, 832 (Minn. App. 2003).

*CUP Requirements*. Article VIII of the 1998[3] Itasca County Ordinances regulates conditional uses of property and includes general provisions, as well as special provisions that apply to shoreland areas. Before a CUP may issue, the applicant must show that

> (A) The use conforms to the land use or comprehensive plan of the County, if any.
> (B) The use is compatible with the existing neighborhood.
> (C) The use will not impede the normal and orderly development and improvement in the surrounding area of uses permitted by right in the zone district.
> (D) The location and character of the proposed use is considered to be consistent with a desirable pattern for development for the area.

Itasca County, Minn., Zoning Ordinance, Art. VIII, § 8.32 (1998) (Ordinance). When a proposed use "may result in a material adverse effect on the environment," the commission may require an applicant to address the "nature and extent of the effect." *Id.* at § 8.33. For shoreland areas, additional criteria must be considered that include "[a] thorough evaluation of the waterbody and the topographic, vegetation, and soils conditions on the site . . ." *Id.* at § 8.25. This evaluation ensures

> 1) the prevention of soil erosion or other possible pollution of public waters, both during and after construction;
> 2) the visibility of structures and other facilities as viewed from public waters is limited;
> 3) the site is adequate for water supply and onsite site sewage treatment; and
> 4) the types, uses, and numbers of watercraft that the project will generate are compatible in relation to the suitability of public waters to safely accommodate these watercraft.

---

[3] In an earlier appeal, this court determined that the CUP/PUD applications would be decided under the county's 1998 zoning ordinances, ruling that application of the current zoning ordinance would result in a manifest injustice to LWBC. *In re Conditional Use Permit & Preliminary Planned Unit Dev. Application of Living Word Bible Camp*, Nos. A06-1374, A06-1850, A07-1231, 2008 WL 2245708, at *3-4 (Minn. App. June 3, 2008).

*Id.* at § 8.25. The commission may attach conditions to approval of a CUP in order to satisfy the objectives of the ordinance provisions, including increased setbacks, limitations related to vegetation, and "special provisions for the location, design, and use of structures, sewage treatment systems, watercraft launching and docking areas, and vehicle parking areas." *Id.* at § 8.26.

*PUD Requirements*. Article IX of the Ordinance sets forth the requirements for PUD approval. The applicant must submit documents, including a proposed development plan, that meet mandates for open space, erosion control and stormwater management, and centralization and building criteria. *Id.* at § 9.34, .49-.51. "[A]t least 50 percent of the total project area must be preserved as open space," and "the appearance of open-space areas, including topography, vegetation, and allowable uses, must be preserved by restrictive deed covenants" or "other equally effective permanent means." *Id.* at § 9.49(1), (7).

The CUP and PUD comprehensively address each of the areas mandated by ordinance. Although the commissioners' decisions are facially valid, relators raise numerous arguments to challenge them.[4]

*Open Space*. Relators Brown and Newton argue that the CUP/PUDs violate the project parameters either sought by LWBC or established in the environmental-review process. Brown stresses that pledges made by LWBC during the environmental-review

---

[4] During oral argument before this court, Brown waived the argument that approvals of the CUP and PUD were premature because they were dependent upon completion of the environmental review. The environmental review is now final, has been decided adversely to relators, and presents no obstacle to our review of the CUP/PUD. *See In Re Declaring a Negative Need for an Envt'l. Impact Statement*, 2014 WL 3557954, at *13.

8

process envisioned retention of 97% open space but that during the hearings on the CUP/PUDs LWBC promised only to retain 50% open space. The commission's decision requires LWBC to "enter[] into and abid[e] by open space covenants that preserve and maintain at least 50% of the project area as open space." Newton argues that the 2013 permit applications did not include an open-space covenant and that the earlier 2006 covenant, to which LWBC had agreed to be bound, impermissibly allowed for the possibility of structures to be built in open spaces.

Relators' arguments do not support denial of the CUP/PUD. While the EAW application refers to 97% retention of the property as "natural, undeveloped open space," the gist of this statement and others like it merely references the percentage of the property that will remain undeveloped, and does not amount to a promise or covenant to retain 97% open space. According to the county, LWBC's 97% representation is "accurate" but refers only to the percentage of the property that will "remain in a natural state;" only 137.5 acres will be subject to an open-space covenant. The CUP does not include a 97% requirement, and other provisions of the CUP protect relators' concerns and satisfy the 50% open-space requirement contained in the PUD ordinance provision. Ordinance, Art. IX, § 9.49. The CUP restricts project construction to fewer than six acres and notes that this restriction, coupled with the open-space covenants, will allow "over 240 acres of the 'property' [to] remain in a natural state." The CUP specifically requires LWBC to enter into covenants to preserve at least 50% open space on the property, which they have done. Additionally, in some respects, such as with reference to mitigation necessary to protect environmental concerns, consideration of this issue revisits the

9

environmental review, which has been definitively decided in favor of allowing the project to proceed.

Newton also argues that the CUP/PUD impermissibly authorizes "possible future commercial development of 'open space,' less than 'in perpetuity' protection of 'open space[,]' and does not prohibit commercial use of 'open space.'" The CUP requires "open space covenants that preserve and maintain at least 50% of the project area as open spaces in perpetuity." CUPs, by definition, run with the land. *See Upper Minnetonka Yacht Club v. City of Shorewood*, 770 N.W.2d 184, 189 (Minn. App. 2009) (stating that "a CUP is a protected property right that is perpetual in nature and runs with the land"); *see also* Minn. Stat. § 462.3595, subd. 3 (2014) (stating that CUPs "remain in effect as long as the conditions agreed upon are observed"). Finding number 34 of the CUP states with regard to preservation of open space:

> The "Camp" is responsible for entering into and abiding by open space covenants that preserve and maintain at least 50% of the project area as open spaces in perpetuity by prohibiting vegetation and topographical alterations (except for routine maintenance), construction of additional buildings, storage of vehicles and materials, and uncontrolled beaching of watercraft. Ordinance, Sections 9.48A and B, and 9.49, subpart 1. These covenants must be developed before the Planning Commission can give final approval to the "Camp's" PUD application (Id. at Section 9.48A). The "Camp" entered into open space covenants in the 2006 permit proceedings that were consistent with its responsibilities under the ordinance, in the Planning Commission's judgment. Those covenants were approved by the legal representatives of the "Camp", the County, and Holly Newton. In the instant proceedings, and prior to final approval of its PUD application, the "Camp" agrees to enter into "open space covenants" containing the same terms as those approved in the 2006 proceedings. By doing so, the "Camp" will meet its

10

responsibilities under the above sections of the ordinance as they preserve 137.5 acres of the "property" as open space and thereby exceed the minimum amount of open space required, prohibit disturbance of trees, vegetation, and topography, and prohibit the construction of additional buildings and the storage of motor vehicles, except as allowed under the CUP and preliminary PUD decisions.

The 2006 open-space covenant requires "preservation of open spaces . . . of at least fifty percent (50%) of the total project area" and adherence to Ordinance § 9.48(A), which requires "preservation and maintenance in perpetuity of open spaces." Article IX, § 9.49 of the Ordinance also requires "open space requirements" to be included within data required for a plan submitted for a preliminary PUD.

Although no new open-space covenant was submitted with LWBC's most recent CUP/PUD application, LWBC did submit the 2006 open-space covenant, and agreed to abide by its terms, and the CUP requires an updated agreement to be in place before final approval of the PUD. This is neither unreasonable nor an arbitrary interpretation of the ordinance provisions, which do not require an open-space covenant, and merely require meeting "open space requirements." Further, as noted, other aspects of the CUP ensure the satisfaction of open-space requirements, as mandated.

*Camp Uses.* Relators argue that the commission approved a CUP that included broader uses for the property than were sought by LWBC. The CUP lists as project uses "a Bible camp, retreat, and learning center primarily for children and ancillary for adults." Condition number 21 of the CUP also addresses permissible uses, stating:

The uses to be made of the property shall include Bible camp, retreat, and learning center uses primarily for children and ancillary for adults. Children-related uses include a summer

11

Bible camp for third to eighth graders eight weeks during the summer, and occasional programs for home-schooled children. Uses also include staff development, marriage retreats and parenting seminars for adults. The majority of uses will take place in the summer months, but weekend retreats and off-season camps will also occur. The uses supported by the project facility are uses that are currently occurring on the lake and include: shelter, accommodations for visitors, swimming, learning, playing, studying, sports, boating, fishing, sailing, cross country skiing, campfires and other recreational activities typical to those about the lake. The capacity of the 'Camp's" project is 150 overnight guests. The "Camp" will be closed a portion of the winter months.

The ordinance defines "youth camp" as

[a]n area organized, developed, managed, and operated . . . for the primary purpose of education, recreation, health or other similar purpose for young persons less than twenty-one (21) years of age. Typical examples of youth camp include, but are not limited to, Boy Scouts, Girl Scouts, 4-H, Churches, public schools, YMCA, among others.

Ordinance, Art. I, § 1.126. Relators argue that the project was initiated as a "youth camp," and adult uses should be prohibited by the CUP/PUD. Both relators also argue that broader use of the property converts the use into a "resort," which the ordinance defines as "a structure or group of structures used primarily as a temporary recreational residence which may or may not provide cooking facilities." Ordinance, Art. I, § 1.089.

We reject these arguments for several reasons. The intended adult uses at the camp do not amount to "recreational" uses and therefore do not meet the definition of "resort." Further, to the extent that the adult uses are "unclassified" and are not among the listed land uses regulated by the ordinance, they could be, and were, processed as conditional uses. *See* Ordinance, Art. I, § 1.027 (permitting an otherwise restricted use

12

with a CUP). Therefore, the commission's decision to permit some adult uses of a youth camp is neither arbitrary nor unreasonable, particularly given the commission's duty to construe the ordinance in favor of the land owner. *See Yang*, 660 N.W.2d at 832.

Newton also argues that the commission acted arbitrarily by approving a CUP that impermissibly authorizes commercial uses on conservation-easement land, authorizes uses never contemplated, such as use of travel trailers, and fails to address the shoreline portion of the property that is below the ordinary high-water mark of the lake.

Newton first argues that the CUP allows a commercial use by allowing the portion of the property included in the conservation easement to be used for "trails for hiking, nature trails, cross country skiing, and other low impact non-motorized activities." This argument is without merit for two reasons: such uses are not commercial as defined in the ordinance, and they are specifically permitted by the conservation easement. The ordinance defines "[c]ommercial use" as "the principal use of land or buildings for the sale, lease, rental, or trade of products, goods and services." Ordinance Art. I, § 1.024. LWBC's planned uses of the conservation easement property do not constitute commercial uses. And although the conservation easement prohibits commercial development "of any kind" on easement property, it specifically allows recreational uses of the property, including establishment of trails for "firebreaks, walking, horseback riding, [and] cross-country skiing." The planned uses are consistent with the conservation-easement mandates.

Newton next argues that the commission acted arbitrarily by including a condition that restricts the use of travel trailers on the property. The CUP generally prohibits more

than one travel trailer on the property, but, with the landowner's permission and for no more than ten days per year, the CUP allows two or more travel trailers on the property. Although the use of trailers was neither sought by LWBC nor included in the CUP/PUD applications, the January 8, 2014 commissioner's meeting transcript shows that the consensus among the commissioners was to include the restrictive condition for the purpose of preventing the property from becoming a campground. This condition was favorable to relators, and any harm due to inclusion of the condition in the CUP was LWBC's to protest as the aggrieved party. *See Marine Credit Union v. Detlefson-Delano*, 830 N.W.2d 859, 864 n.3 (Minn. 2013) (conferring standing on a party if the party suffers an injury-in-fact, defined as "a concrete and particularized invasion of a legally protected interest"); *In re Application by City of Rochester for Adjustment of Serv. Area Boundaries*, 524 N.W.2d 540, 542 n.1 (Minn. App. 1994) (stating that a party is aggrieved for purposes of appealing zoning decision, if the decision "operates on his rights of property or bears directly upon his personal interest").

Finally, Newton challenges the commission's decision as based on an incorrect conclusion that the commission lacked jurisdiction to control the use of shoreline property below the ordinary high-water mark of Deer Lake. The commission had a valid concern about encroaching upon the Minnesota Department of Natural Resources' (DNR's) area of control; under Minn. Stat. § 84.027, subd. 2 (2014), the DNR has "control of all the public . . . waters." Newton's environmental concerns are addressed in the CUP, which includes conditions to protect the unique environment of the lake while

14

respecting the authority of the DNR to control common waterways. The CUP conditions restrict the numbers, types, and uses of LWBC boats and docks.

Because relators have not shown a valid legal ground for challenging the commission's approval of the CUP and PUD, we affirm its decision to approve them.

## II.
## FPUD

Article IX of the ordinance sets forth the procedure for FPUD approval. Following submission of the final plan to the commission, the commission must meet to "review the final plan and verify that said plan has incorporated all changes of the preliminary plan required by the Commission; otherwise, it shall conform to the preliminary plan." Ordinance, Art. IX, § 9.63. The FPUD procedure also requires final approval "to include the requirements set forth in [Ordinance Art. IX, §] 9.48-9.51." Ordinance Art. IX, § 9.60. These sections reference maintenance and design criteria, open-space requirements, erosion control and stormwater management, and centralization and design of facilities. Ordinance, Art. IX, § 9.48-.51.

The 19-page FPUD decision addresses and incorporates each of these mandates. Among the FPUD's findings is the following recognition of changes required by the preliminary PUD:

> The approval contained directives relating to covenants, and matters that the "Camp" must add to the site plan in order for its final plan to be given final approval, to-wit: "that before final approval, the requirements set forth in Section 9.48 of the Zoning Ordinance shall be developed to preserve and to maintain open spaces in perpetuity and for the continued existence and functioning of the development (condition 27); [that] the parking areas shall be designed to keep runoff out of

15

adjacent wetlands and a snow stockpile area away from the wetland will also be identified on the final plan (condition 28); [that] a snow storage will occur outside of the proposed infiltration basins and will be identified on the final plan (condition 30); and [that] use of the lakeshore shall be limited to focused areas near the swimming beach and boat docks and these focused areas shall be identified on the final plan (condition 7).

The FPUD decision includes numerous, comprehensive findings to satisfy each of the ordinance requirements. The decision also specifically addresses "concerns and objections" raised by relators and others, and responds to those issues in detail. The decision ultimately approves the FPUD, concluding that the project conforms to the preliminary PUD and CUP, incorporates necessary changes to the preliminary PUD, and complies with relevant ordinance requirements.

Relators Brown and Newton assert numerous arguments to challenge the commission's approval of the FPUD, but these arguments primarily repeat arguments they made to challenge the CUP/PUD. Brown also argues that the commission failed to take the requisite "hard look" at the relevant issues, issued the FPUD in violation of the clear requirements of the ordinance, and issued a decision that was arbitrary and capricious. *See In re Block*, 727 N.W.2d 166, 180 (Minn. App. 2007) (reversing issuance of a CUP for a dog breeding facility as arbitrary and capricious when the county failed to take a "hard look" at whether to approve CUP condition requiring dogs to be debarked); *Yeh v. Cnty. of Cass*, 696 N.W.2d 115, 133 (Minn. App. 2005), (vacating approval of PUD when developer sought expansion of resort that was actually residential, rather than commercial, in violation of ordinance), *review denied* (Minn. Aug. 16, 2005). Brown

16

suggests that project deficiencies included inadequate information to support PUD approval, altered site-plan information, improperly drafted open-space covenants, inadequate calculations for impervious-surface acreage, inadequate parking, absence of stormwater-management plans, no detailed grading plan, inadequate septic plan, and excessive uses in violation of zoning restrictions. These arguments were extensively considered by the commission on a record that included detailed information on all aspects of the project. The commission's decision was based on the pertinent ordinance provisions, included findings that the requirements of the ordinance were met, and included a full explanation of the basis for its decision. *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416 (Minn. 1981) (requiring municipal body to "at a minimum, have the reasons for its decision recorded or reduced to writing and in more than just a conclusory fashion"). On this record, we cannot conclude that the decision of the commissioners was unreasonable or arbitrary; *see also Molnar v. Cnty. of Carver Bd. of Comm'rs*, 568 N.W.2d 177, 181 (Minn. App. 1997) (stating that a county's land-use decision will not be disturbed "unless it has no rational basis").

Newton makes slightly different arguments than Brown: she first asserts that the process used by the commission was unfair because LWBC was allowed to submit filings after the CUP/PUD were approved, which "allowed LWBC to make serial changes in data on documents . . . using the hearing process as a 'vetting' of opponent positions." The process used by the commission was consistent with the ordinance provisions, and reasonable. Article IX, section 9.29 envisions a preliminary PUD that "assures the general acceptability of the layout." In the final approval process, the commission has a

duty to review the final plan to ensure incorporation of "all changes of the preliminary plan." Ordinance, Art. IX, § 9.63. The commission has the authority to "[r]equest further changes or amendments of the final plan" or "[t]able for further study and review." *Id.* § 9.64. The process conceived by the ordinance does not limit the commission to approving only the plan envisioned in the preliminary PUD, and the commission's actions during consideration of this final PUD do not demonstrate a violation of the ordinance.

The FPUD approval process used in this case was akin to the process used to approve a plat, in which review of a preliminary plan is comprehensive, subject to alteration but not comprehensive review during the final plat-approval process. *See Semler Constr., Inc. v. City of Hanover*, 667 N.W.2d 457, 462-63 (Minn. App. 2003) (noting two-tier statutory provisions for plat approval applies comprehensive consideration to the preliminary plat and that "once the conditions and requirements [for preliminary plat approval] are satisfied, the plat mechanically receives final approval"), *review denied (Minn. Oct. 29, 2003); but see Save Lantern Bay v. Cass Cnty. Planning Comm'n*, 683 N.W.2d 862, 866 (Minn. App. 2004) (stating that the summary nature of final plat approval acknowledged in *Semler* does not "strip final-plat decisions of all meaning" and that "[f]inal-plat decisions are still subject to review for mistake or abuse of discretion").[5] We are satisfied that the commission complied with this process.

---

[5] No specific caselaw pertaining to PUDs makes similar statements, but factual scenarios for plat approval and PUD approval are analogous.

18

Newton also asks this court to revisit issues pertaining to the parking lot, use of travel trailers, and the related issues of stormwater management and erosion control. Regarding the parking lot and travel trailers, Newton challenges the number of parking lot spaces, (25), approved for the project and the use of travel trailers. She argues that neither of these items was considered in light of the specific uses granted for the property. These issues were considered in the CUP and preliminary PUD, were not among changes to the CUP/PUD, and were not included among the items to be considered in the FPUD. As such, they were outside the scope of review of the FPUD process, and the commission had no duty to consider them. See Ordinance, Art. IX, § 9.48-.51.

Regarding stormwater management and erosion control, Newton argues that no plan was included in the FPUD (or the preliminary PUD) for either item. Article IX, section 9.50 of the ordinance states that "[e]rosion and stormwater management plans must be developed." Before the FPUD is approved, the commission must again consider section 9.50. Ordinance, Art. IX, § 9.64. But, as the county argues, LWBC included in its submissions to the commission extensive, specialized materials regarding these matters. The county refers to a hydrology report submitted by a professional engineer, as the "plan."[6] The master plan also includes 2-foot grading contours, infiltration basins, and clearing limits among its erosion protective measures. The ordinance does not define what must be included in either type of plan. The commission ordered no changes to be

---

[6] At the March 12, 2014 meeting, the attorney for LWBC said, "[T]here is a stormwater management plan. It's been prepared by a professional engineer and it's called a hydrology report. It's attached . . . to the documents we've already presented [in the CUP proceedings]."

19

made with regard to these matters in the CUP/PUD; the detailed FPUD findings recognize that sufficient information was submitted to constitute "plans" for purposes of the ordinance; and the FPUD included precise mandates to address these areas, including directives for compliance during construction.[7] The record thus satisfies the documentary requirements for stormwater-management and erosion-control plans.

**Affirmed**.

---

[7] During its final meeting, the commissioners discussed how the plans for erosion and stormwater management had evolved, noting the particularity of requirements contained in the site maps and how there was a specific permitting process that required LWBC to obtain "over-the-counter" permits during construction, some from other entities, to ensure compliance with CUP conditions.