SCOTT COUNTY LUMBER COMPANY,
INC., et al., Appellants,

v.

CITY OF SHAKOPEE, Respondent.

No. C6–87–897.

Court of Appeals of Minnesota.

Jan. 12, 1988.
Review Denied March 23, 1988.

Timothy R. Thornton, Sue Halverson, Hart, Bruner, O'Brien & Thornton, Minneapolis, for appellants.

Phillip R. Krass, Krass & Monroe Chartered, Shakopee, for respondent.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LOMMEN,* JJ.

## OPINION

HUSPENI, Judge.

Appellant, Scott County Lumber, applied to the Shakopee city council for a conditional use permit to extract gravel for a 130 acre tract of land in the city of Shakopee. After the request was denied, Scott County Lumber appealed to the trial court. The trial court affirmed the decision concluding that the city council resolution contained legally sufficient reasons to support denial of the permit. Scott County Lumber appeals requesting review of the city council's decision. We reverse.

## FACTS

Scott County Lumber owns a 130 acre tract of land in Shakopee county, purchased in 1971. There is a rich gravel deposit in the soil. The land, situated less than one mile from the Canterbury Downs racetrack, is surrounded on three sides by tracts of privately owned land and on the fourth side by a highway. One neighbor operates a thirty-one horse livery and riding stable. A second property is operated as a small farm, housing in recent years one hundred hogs and ten cattle. The third tract is subdivided with residences on some lots. Permission has been granted for the construction of a by-pass through the subdivision.

The area in which Scott County Lumber and its immediate neighbors are situated is zoned as an Agricultural Preservation District pursuant to section 11.24 of the Shakopee city code. A gravel pit is a permitted use under this classification. The code lists the conditional uses of land permitted by the city. Before a landowner may put the

land to a conditional use, a permit must be obtained from the city council.

Gravel extraction is a conditional use for which a permit is required under the Shakopee city code. On September 21, 1984, Scott County Lumber applied for a conditional use permit to extract gravel from its land. The next month, the city hired a consultant to assess the project, prepare an environmental assessment worksheet and make recommendations regarding the granting of a permit. In December 1984, sound tests were conducted by experts at the site of a project similar to the proposed plan. Both the environmental assessment worksheet recommendation and the sound test results favored the granting of a permit to Scott County Lumber.

Subsequently, the application was referred to the city planning commission for its decision. Section 11.04, subd. 6 of the Shakopee city code sets out twelve criteria which the planning commission must consider when determining whether to grant a conditional use permit. The application must satisfy the twelve conditions, if applicable, before the permit may be granted. The city planner recommended granting the permit conditional on Scott County Lumber satisfying twenty further conditions. The conditions set stringent standards for, among other items, dust, noise and traffic control. Scott County Lumber agreed to take the action necessary to meet all twenty conditions. If the applicant was to subsequently fail to maintain the standards required by the planning commission, the city could revoke the permit.

In May and June of 1985, the commission conducted a public hearing and received comments on the proposed gravel pit. After considering the environmental assessment worksheet recommendation, the results of the sound tests, the city planner's recommendations and the statements of the witnesses, the commission refused to grant the permit.

Scott County Lumber appealed the planning commission's decision to the city coun-

---

* Acting as Judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

cil. In July 1985, a second public hearing was conducted by the city council. The city council had before it all the recommendations and testimony which the planning commission had considered. In addition, the city council heard testimony from experts, appraisers and landowners. The city council denied Scott County Lumber's request for a conditional use permit.

Scott County Lumber appealed the denial to the district court. All the documents considered by the planning commission and the city council were presented to the trial court. These were the environmental assessment worksheet, the staff recommendation from the city planner, the appraisal report by Hagemeister & Associates and the 1981 appraisal report with accompanying updated recommendation from Ken Lewis & Associates. All recommended granting the permit.

The trial court also had before it the transcripts of the hearings. It also received testimony from all the witnesses who had appeared at the public hearings. In addition, an appraiser appointed by the city appeared for the first time before the trial court. Excerpts from the transcripts and testimony are set out below.

**The testimony of the experts**

Merila & Associates, the engineers who prepared the application for the conditional use permit on behalf of Scott County Lumber, testified at all three hearings, opining that the proposed plan met the criteria set out by the Shakopee city code and the city planner. The testimony indicated that the proposed plan will span seventeen years, that the mining depth will be between ten and twenty-five feet and that during the seventeen year period an average of 75 trucks will leave the site between the hours of 8:00 a.m. and 5:00 p.m. each day. The gravel extraction is planned to occur in three phases, the activity will be screened by ten foot grassy berms planted with trees, a twenty-five foot stockpile will accumulate, and each section of land will be reclaimed for agricultural use after a phase is completed. None of the drilling or other activities will be conducted within 100 feet of adjacent property lines or within 500 feet of any residence. Merila testified that the noise level management tests indicated the noise from the crusher would no longer be audible at a distance of one-eighth of a mile from the machine and that the noise from the back-up beepers on the trucks could be eliminated. A storm sewer leading into a local lake will drain the land, and storage ponds will prevent flooding of the neighboring land. The gravel will be damp when extracted, but water spraying will be used to control dust. The water for this purpose will be transported onto the site by thermos. The engineer stated that the estimated gravel pit traffic amounted to 1.8% of the existing traffic at the date of the trial, that a highway access permit required for the proposed gravel entrance was one of the twenty conditions laid down by the city planner, and that a right turn lane and extra long entry acceleration lane were planned to meet the requirement.

Dr. Alfred Caldwell, a university professor and expert soil scientist, opined that soil erosion would be minimized by the proposed extraction. Based on his expertise in the field, he testified that the soil in the Shakopee area is below average to poor, that it is not prime agricultural land and that although a good soil manager could produce high yields, the level of production could not be maintained. Caldwell stated that in his experience careful soil segregation during extraction followed by surface soil replacement would restore the soil to a level "approximately as good as it ever was from an agricultural standpoint."

Mr. Rudolf Hoagberg, an environmental geologist, testified that a study conducted by him for MN/DOT in 1979 indicated that there was a shortage of gravel in Minnesota, that the Scott County Lumber 130 acre tract was a "very good deposit" and that the operation would make a "highly significant" contribution to the gravel supply in the area. He opined that if the gravel operation was properly managed, it would have no adverse effect on the local water supply because the water table was so deep. Hoagberg said that in his experience of working with "hundreds" of gravel oper-

ations, noise could be effectively controlled by the use of berms and trees.

John Shardlow, the landscape architect and city planner who prepared the environmental assessment worksheet for the city, testified that the conditional use permit would not be inconsistent with the comprehensive plan and that he believed there was no inconsistency between the excavation of gravel and the purposes of the zoning code. Shardlow testified that he understood from the city planner that the "application was a controversial and political issue" and that he therefore advised the city planner "to do a good solid professional job of reviewing the environmental impact and to develop conditions which in her professional judgment would mitigate those impacts." He stated that the twenty additional conditions placed on the permit were on the "strict side" and that he could identify no environmental impact which could not be mitigated by the conditions imposed.

Jerome Hagemeister, a professional appraiser, testified that the city council hired him to determine whether the property values in the Killarney Hills subdivision and other properties surrounding the proposed gravel operation would decrease in value if the permit was granted. He said that no comparables were used in drawing up his appraisal because he was not asked by the city to place a value on the properties. Hagemeister stressed that in this case the value of the land was constantly changing due to the relocation of the 169 by-pass, the paving and upgrading of highway 83 and other roads and the development of the racetrack. He said that in his opinion the gravel operation would not result in devaluation of the surrounding properties, that the city would have a great deal of control over the operation through the twenty stringent conditions imposed on the granting of a permit and that this control would result in increased land values in the area.

Bradley Larson, the county highway engineer, testified that in his opinion the anticipated truck traffic would not cause traffic problems on highway 83. He stated that a county road entrance permit was required of Scott County Lumber and that as a part of the access permit long acceleration lanes would be installed to overcome the problem of slow-moving trucks entering the traffic flow.

**The testimony of the landowners**

Bert Noterman, one of the owners of Scott County Lumber, testified that he had lived in the city of Shakopee for eighty-three years, and was "concerned about running an operation which was acceptable in the community." He explained that this was his second application for the permit to extract gravel from his land, that every effort had been made to provide the city with a properly researched and well-planned proposal and that the application had proved to be a very costly exercise.

Raymond Fitch, a Minneapolis lawyer who owns property abutting Scott County Lumber land, testified that he bought the land in 1983, not as a residence for himself, but for his daughter to operate as a horse ranch. Fitch admitted that he was on notice in 1983 that gravel extraction was a conditionally permitted use in the area. He conceded that although he did not have the required conditional use permits, he increased the number of horses on his land from five to thirty-one. Fitch stated he was concerned that the peacefulness and beauty of his property would be destroyed by the noise, dust, berms and stockpiles created by the operation, that the value of his land would diminish and that the gravel trucks would create a traffic hazard as they entered the highway.

Anne Fitch testified that she lived on the Fitch property with her brother and a friend and that she ran the horse farm. She stated that horse farms were never sited next to gravel pits and that she believed dust caused disease in horses but admitted she had no experience of such illness in horses. She admitted that a veterinary associate, who tended the Fitch horses, wrote to the city alleging the gravel operation would cause health problems in horses, that the associate's two principals contacted the city council and contradicted their employee stating there would be "no serious health problems resulting from gravel pits provided there was no

excessive dust" and thereafter that the veterinary associate who had left the area informed the city council that she had no experience with dust-related illnesses in horses. Anne Fitch conceded that she considered the gravel pit "distasteful and inconsistent with the horsey set that looks for style when they come to the property." She opined that it would be impossible to control dust "when you have bare acres that will blow on your land."

The Rutts own land which abuts the proposed gravel pit and was purchased seventeen years ago. They testified that in their opinion the proposed gravel operation should be surrounded by a one mile buffer zone, that grass would not grow on the berms, that erosion would occur and cause dust problems and that the land could not be reclaimed for agricultural purposes. John Rutt conceded that he had raised one hundred hogs on his land without required permits. He voiced his concern that the berms would interfere with his view of Canterbury Downs, but conceded that if Scott County Lumber planted a tree farm, his view would similarly be obscured. He admitted that his sole experience with real estate was the purchase of his land in Shakopee. His opinion that the gravel pit would devalue his land to "almost nothing" was based upon "just more or less common sense."

Harold Schneider, who owns twenty-eight acres in the vicinity of the Scott County Lumber land, admitted raising two hundred hogs and one hundred and fifteen cattle without the appropriate permits. He testified that he owned two rental properties on his land and said that in his view the rental revenue would fall if the permit was granted. He believed the proposed berms would be twenty-five feet high with a four to one gradient and would ruin his land. (Various experts testified at all three hearings that the berms would be temporary, ten feet high with a gradient of ten to one making them almost indistinguishable, that the berms would be planted with grass and shrubs and that the berms need not be constructed if the neighbors preferred trees alone.) Roberta Schneider testified that there were other sources of gravel which should be researched and that the gravel from the proposed pit was not exclusively for use in Shakopee.

## The testimony of the city council members

Mayor Aldon Reinke, who voted to deny the permit, admitted that he based his decision regarding potential traffic problems exclusively on the testimony of property owners in the area. He stated that in his opinion the extraction of gravel from Scott County Lumber's land was "absolutely prohibited" and presumed that the property owners would sue the city for diminishing property values and "probably receive compensation." Reinke testified that the operation would create a noise nuisance, but admitted that the conditions attached to the permit would require noise control to be within the law. He conceded that the Scott County Lumber application was singled out for enforcement of noise regulations and subjected to stricter regulations than the law required, and that no other proposed development in the area had been treated in this way. Reinke opined that dust could not be controlled, admitting that this was his personal feeling and that he had experienced successful enforcement of dust control regulations during construction at Canterbury Downs.

City council member John Leroux voted to deny the permit, admitted "glanc[ing]" at the environmental assessment worksheet, said that it did not influence his vote and that he based his decision on landowners' testimony. He admitted that neighboring landowners were biased against the permit, that the city planner was objective, but that he discounted her recommendation because she did not live next to the proposed pit. He discounted the testimony of all the experts on the same basis.

City council member Gloria Vierling testified that her vote to deny the permit was affected by the opinions of Rutt, Fitch and Schneider. She stated that she relied on her own personal feelings, that her home was next to a gravel pit, that she would prefer all gravel trucks be kept off the

road and that she believed a conditional use permit to extract gravel should be prohibited if there was a residence nearby. Vierling conceded that Fitch's testimony could be biased and agreed that the city planner, the city engineer and Shardlow, all city employees, were objective.

City council member Jerome Wampach testified that the environmental assessment worksheet did not influence his vote. He admitted that he "went primarily on what the pit was going to do to the landowners" and that he only listened to the neighbors' testimony. Wampach testified that he dismissed the city planner's recommendation because she did not live next to the pit. He indicated his concern about "the big hole left in the ground," about the dust, about the "health of people and animals" and about property values. Wampach conceded that he could point to no basis in the record for his fears. The record indicates that Wampach believed that when the topsoil was removed from the site, it could never cover the land after the gravel was removed.

City council member Dean Colligan admitted that he had "little idea at the time of the hearings" regarding the use of the land adjacent to the proposed pit. He admitted that he had no idea what the environmental assessment worksheet concluded, to feeling "sorry" for Rutt and that this influenced his vote. He stated that the standard of dust control was that which would satisfy adjacent landowners and "the gravel pit has too much dust" to meet his approval. Colligan believed that the Fitch horse business would be curtailed by the dust and noise.

### The testimony of the city's appraiser

Finally, the trial court heard testimony from an appraiser appointed by the city. He admitted that he had looked at the land once, that he had not seen the environmental assessment worksheet, that he did not know that twenty conditions had been placed upon the granting of the permit, that he did not know what the city planner had recommended, that he had not seen the applicant's proposal regarding dust and noise abatement, that he did not know of the reclamation plan and that he did not know if the noise levels would violate the city ordinance. He conceded that he spent only eight hours reviewing all the documents and that he had many clients in Shakopee with land use different from the proposed use. He testified that in his opinion the granting of a conditional use permit to extract gravel would substantially diminish the value of the surrounding properties.

The trial court affirmed the city's denial of the conditional use permit. It found that the planning commission had given a hearing to all interested parties and that the city council resolution contained legally sufficient reasons to support denial of the permit. In addition, the trial court found that the proposed gravel pit would create a traffic hazard, would have a detrimental effect on the use, enjoyment and value of neighboring properties, and would not be compatible with the use of other properties in the area. The applicant's motion for amended findings or alternatively for a new trial was denied.

### ISSUE

Were the city council's reasons for denying the conditional use permit to extract gravel supported by legally sufficient facts?

### ANALYSIS

■ Upon appeal from a trial court decision affirming a city council's denial of a conditional use permit, the reviewing court must independently review the record which was before the trial court together with the city's decision without affording any special deference to the trial court's review. *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865, 868 (Minn. 1979).

■ A city council has broad discretionary power to grant or deny an application for a conditional use permit to extract gravel. *Zylka v. City of Crystal*, 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969). When, as in this case, a zoning ordinance expressly authorizes the proposed use by conditional use permit, the city's denial of

the permit must be for reasons relating to public health, safety and general welfare. *C.R. Investments, Inc. v. Village of Shoreview*, 304 N.W.2d 320, 324 (Minn.1981).

■ When a city council states its reasons for denying the permit, we are required to assess the legal sufficiency of the reasons given and to determine whether, if legally sufficient, they had a factual basis. *C.R. Investments*, 304 N.W.2d at 325. If the denial of a permit is not unreasonable, arbitrary or capricious, it will be upheld on appeal. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416–17 (Minn.1981). This court must, therefore, determine whether the city council's action in denying the permit in this particular case was reasonable.

■ We note that the setting aside of routine city council decisions is reserved for those rare instances in which the city's decision has no rational basis. Except in such cases, a reviewing court has the duty to exercise restraint and accord appropriate deference to the city council in the performance of its duties. *White Bear Docking v. City of White Bear Lake*, 324 N.W.2d 174, 176 (Minn.1982).

■ Where a zoning ordinance specifies standards which must be applied in determining whether or not to grant a conditional use permit, and the applicant fully complies with the specified standards, a denial of the permit is arbitrary as a matter of law. *Hay v. Township of Grow*, 296 Minn. 1, 5, 206 N.W.2d 19, 22 (1973). It is uncontested that Scott County Lumber has complied with the lengthy and expensive requirements of the Shakopee city authorities in making this application to extract gravel from its land. Appellant employed experts to design a project which would meet the twelve requirements for obtaining a permit which were laid down in the Shakopee city code. In this case there were twenty further conditions to the granting of a permit imposed upon appellant.

■ The expert testimony, the city planner, the environmental assessment worksheet recommendation and the appraisal report all indicated that the application met the twelve criteria laid down by the Shako-

pee city code. Furthermore, it is uncontroverted that appellant agreed to comply with the twenty additional conditions imposed by the city upon the granting of a permit. Upon a thorough review of all the evidence before the trial court, we cannot conclude that the city council acted rationally when it denied the conditional use permit.

The twenty additional conditions imposed by the city planner placed stringent controls on noise, dust and traffic. The record reveals that the city placed stricter controls on this application for a conditional use permit than on any other proposed project in the area. The engineers, the landscape architect/city planner, and the county highway engineer all testified that the twenty conditions mitigated any environmental impacts in the form of noise, dust and water pollution and prevented traffic hazards. The record indicates that the twenty conditions provide the city with adequate control over the project to ensure that the gravel operations would have a minimum impact upon the environment. The record indicated that there are several phases to the proposed plan for the gravel extraction and that when each phase is completed, the land will be reclaimed for agricultural use.

An expert soil scientist indicated that the land could be reclaimed and would approximate to its present value as agricultural land. This expert also indicated that the Shakopee land was not prime agricultural land. Other experts testified that the reclaimed land could have a much higher value than at present. The expert appraiser stated that in his opinion the gravel operation would not devalue the neighboring land but rather that these properties would increase in value.

The environmental geologist, an expert in Minnesota's gravel needs and resources, testified to the shortage of gravel in the state. His testimony indicated that the gravel deposit in the proposed project would provide good quality, less expensive gravel in the Shakopee area.

In contrast with the convincing testimony of the experts above, the city's appraiser was impeached by his admissions that he

had made but a cursory examination of all the reports, test results, proposals and recommendations. He was neither aware of the twenty rigorous conditions imposed upon the application by the city nor of appellant's proposals to meet those conditions. He conceded that he had clients in the Shakopee area with interests which competed with those of appellant. Yet he proffered a professional opinion that the gravel operation would seriously harm neighboring property values.

Neighboring landowners expressed only their own opinions regarding the effect of the gravel operation on the value of their land, on pollution of the water, on noise nuisance, on dust problems and on the aesthetic impact of the environment. They provided no expert testimony to support their views. A veterinarian who expressed an opinion regarding the impact of the gravel operation upon the Fitch horses later conceded that she had no experience with dust related equine disease. None of the neighbors could attest to expertise in real estate, yet they stressed the devaluing impact of the gravel pit upon their land. One landowner admitted that his opinion on land values was based only upon "common sense."

However, the city council members admitted discounting the wealth of expert testimony in favor of that of the neighboring landowners. They admitted that the neighbors were biased and that the experts, some of whom were city employees, were objective in their recommendations. Two of the city council members admitted that they had not even read the environmental assessment worksheet and two discounted the city planner's and the experts' opinions because they did not have their homes adjacent to gravel pits. No city council members expressed any doubt about the validity of the experts' evaluations or testimony. Each expressed only his or her fears of being sued by the neighbors, of dust, noise and water pollution, and of traffic hazards. One city council member admitted that he could not point to any basis in the record which supported his concerns.

Community opposition to a landowner's desire to use his property for a particular purpose is not a legally sufficient reason for denying a conditional use permit. *C.R. Investments*, 304 N.W.2d at 325; *Amoco Oil Company v. City of Minneapolis*, 395 N.W.2d 115, 118 (Minn.Ct. App.1986). The denial of a conditional use permit must be based on something more concrete. Our thorough review of the documents and the transcripts of the three hearings together with the testimony of the city council members leads us to the conclusion that the opinions of the landowners were preferred over those of experts without any adequate supporting reasons. We not only find the reasoning of the city council members unconvincing, but hold that the grounds for denying the conditional use permit are legally insufficient and without any rational basis.

### DECISION

The city council's denial of a conditional use permit for the extraction of gravel was arbitrary because it was not supported by legally sufficient reasons. The denial of the permit is reversed and the granting of the appropriate conditional use permit to Scott County Lumber is hereby ordered.

Reversed.