# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1475

Jeffrey A. August,
Relator,

vs.

Chisago County Board of Commissioners,
Respondent.

**Filed August 17, 2015**
**Affirmed**
**Reilly, Judge**

Chisago County Board of Commissioners

Terry A. Watkins, Watkins Law Office, LLC, Faribault, Minnesota (for relator)

Paul D. Reuvers, Nathan C. Midolo, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent)

Considered and decided by Worke, Presiding Judge; Reilly, Judge; and Stoneburner, Judge.[*]

## S Y L L A B U S

In determining whether to grant a conditional-use permit, the responsible government unit may consider the resulting noise from the proposed use even if the noise levels do not exceed the sound level limits promulgated by the responsible state entity.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**O P I N I O N**

**REILLY**, Judge

Relator-landowner Jeffery August challenges respondent Chisago County Board of Commissioners' (county board) denial of his conditional-use permit (CUP) application. August argues that (1) the county board's denial was arbitrary and capricious and (2) the county board erred when it failed to consider certain Minnesota Pollution Control Agency (MPCA) rules. Additionally, August seeks sanctions and attorney fees under Minn. Stat. § 549.211 (2014). We affirm.

**FACTS**

**The Property**

In 2003, August purchased a 20-acre tract of land located in the Sunrise Township (the property). The property is zoned for agricultural use. Agricultural use in Chisago County is "intended to provide areas to be utilized for agriculture and agriculture related uses and low density residential areas." Chisago Cnty. Zoning Ord. (CCO) § 5.06(A) (2008). The majority of the land surrounding the property is developed in a rural, residential manner, with farm fields or residential lawns. There is minimal vegetation or barriers screening the property.

During the past few years, August built a fenced-in arena on his property for mounted shooting events. He later built an announcer's booth with a public announcement system to use in connection with the events. In 2013, August formed a club, Cowboy Mounted Shooting, and began hosting mounted shooting competitions and clinics. Mounted shooting competitions consist of 10 to 15 contestants who ride on

horseback while attempting to shoot balloons on mounted posts in the center of the arena. Contestants shoot at the balloons with .45 caliber blanks.

August typically holds these competitions on Saturdays from 10:00 a.m. to dusk and on Sundays from noon until 6:00 p.m. In connection with the competitions, contestants and spectators camp overnight in either tents or RVs in an adjacent pasture on the property. In addition to the competitions, August hosts "major shoots," which typically span the course of a three-day weekend. August also offers one-day clinics where club members can train and learn safety skills. The 2014 schedule listed two clinics, five shoots, and five major shoots.

In 2014, after receiving complaints about the property, the Chisago County Department of Environmental Services and Zoning (zoning department) investigated the property. The zoning department determined that August's use of the property did not conform to its zoned use.

**CUP Application**

The zoning department advised August of the need for a CUP, and August applied for a CUP in May 2014. On May 23, 2014, the zoning department informed August that his CUP application was incomplete. August submitted additional information concerning the property and the CUP application. The additional information explained that the noise from gunfire would cease just before dusk and that mounted shooting events would be limited to seven weekends.

August then met with zoning department staff and agreed to have his application processed as rural retail tourism/commercial outdoor recreation use. August submitted an

3

additional letter that addressed the "small-scale" and "low-impact" criteria of the rural retail tourism criteria. The Sunrise Township Planning Commission recommended a limited CUP.

**Sunrise Township Recommendation**

On June 19, 2014, the Sunrise Township Board (township) recommended denying the CUP application under section 8.05 of the CCO due to negative impact and the intrusion of noise caused by the proposed use. The township cited to the "noise based on the PA system and approximately 2,000 rounds [fired] per day" as the grounds for its denial.

**Chisago County Planning Commission Recommendation**

On July 3, 2014, the Chisago County Planning Commission (planning commission) solicited public comments at a public hearing. Zoning department staff prepared a report in preparation for the hearing. With regard to the possible impact on neighboring properties, the report noted that the noise at the property, as estimated by the staff, "does not exceed, or even approach, the MPCA decibel limit." The report, however, stated that the noise is "easily audible from the four properties visited by Staff" and that "steady gunfire over the daylight hours of many weekends would rise to the level of significant annoyance for neighboring landowners." Ultimately, the report recommended approving the CUP with conditions.

At the planning commission public comment hearing, multiple neighbors expressed concerns over

4

the fairly constant noise from the shooting, the volume of shots fired being often over 1,000 rounds per day, the use of the loudspeaker, the loss of peace and quiet and enjoyment of their property, potential property value depreciation, disruption to the rest and repose of small children, animals, livestock and the general negative impact to their quality of life.

All neighbors commenting on the proposed CUP agreed that the noise caused by the mounted shooting events was significant and disruptive. Conversely, club members spoke in support of granting the CUP. When asked by the planning commission if August could reduce the number of competitions per season to four, August replied that he could not do so because it would not permit his club members adequate access to competition. The planning commission discussed the CUP and voted to recommended denial because it would violate "Section 4.15, part D, part five [of the rural retail tourism criteria], 'creates negative impact on the neighborhood by intrusive noise.'"

**Chisago County Board of Commissioners' Denial**

On July 16, 2014, the county board held a public hearing and discussed the CUP application. At this meeting, one of the members of the planning commission provided comment during the citizens' forum, stating that he strongly opposed the CUP. In addition, a county board member voiced concerns regarding the decibel level: "I'm concerned about a legal question which has been raised by the applicant, which I think has not been addressed. And that is the decibel level. I think that that kind of issue . . . needs to be addressed . . . ." The county board voted to deny the CUP application three-to-one with one abstention. Their denial incorporated the findings of the planning commission, denying the CUP "based upon its conflict with the required performance

5

characteristics cited in Section 4.15 of the Chisago County Zoning Ordinance governing rural retail tourism uses."

August appeals by writ of certiorari.

## ISSUES

I. Was the county board's denial of the CUP application unreasonable, arbitrary, or capricious?

II. Is August entitled to attorney fees?

## ANALYSIS

## I.

A county board's decision regarding a CUP is quasi-judicial and reviewable by writ of certiorari. *Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 574 n.5 (Minn. 2000); *Picha v. Cnty. of McLeod*, 634 N.W.2d 739, 741 (Minn. App. 2001). We independently review a county board's decision to grant a CUP to determine if it is unreasonable, arbitrary, or capricious. *RDNT, LLC v. City of Bloomington*, 861 N.W.2d 71, 75 (Minn. 2015).

"County zoning authorities have wide latitude in making decisions on conditional use permits, and except in rare cases where there is no rational basis for the decision, it is the duty of the judiciary to exercise restraint and accord appropriate deference to civil authorities in routine zoning matters." *Big Lake Ass'n v. Saint Louis Cnty. Planning Comm'n*, 761 N.W.2d 487, 490 (Minn. 2009) (quotations omitted). But "[a] municipality may not base its denial on 'unreasonably vague or unreasonably subjective' standards." *BECA of Alexandria, L.L.P. v. Cnty. of Douglas ex rel. Bd. of Comm'rs*, 607 N.W.2d 459,

6

463 (Minn. App. 2000) (quotation omitted). A denial of a CUP is arbitrary where the applicant establishes that all of the standards specified by the zoning ordinance as conditions of granting the permit are satisfied. *Yang v. Cnty. of Carver*, 660 N.W.2d 828, 832 (Minn. App. 2003). The burden on a landowner challenging the denial of a CUP is lighter than one challenging the approval of a CUP. *RDNT, LLC*, 861 N.W.2d at 75 n.4.

In determining whether a governing body acted unreasonably, arbitrarily, or capriciously, we first determine whether the reasons provided by the governing body were legally sufficient. *RDNT, LLC*, 861 N.W.2d at 75-76. Second, if the reasons given are legally sufficient, we must determine if the reasons had a factual basis in the record. *Id.* at 76. August claims that the planning commission did not address the zoning ordinance criteria and failed to provide a proper and sufficient legal basis for the denial of his CUP.

**A.**

The zoning ordinances allow the following as conditional uses for agriculturally zoned property:

> Commercial recreation areas that are similar to public recreation areas including private campgrounds, golf courses, swimming pools, resorts, and crafting uses such as quilting and scrapbooking. Restaurants and/or liquor establishments when clearly incidental and associated with the primary commercial recreation use.

Chisago Cnty. Zoning Ord. § 5.06, subd. (C)(5) (2008).

In deciding whether to issue or deny a CUP, the county's zoning ordinance states, in relevant part, that the planning commission

7

shall consider possible effects of the proposed conditional use based upon (but not limited to) the following general factors and any other requirements set forth in this Ordinance or deemed otherwise relevant:

> 1. The Comprehensive Plan and development policies of the County;
>
> . . .
>
> 3. The use shall be sufficiently compatible or separated by distance or screening from adjacent development or land so that existing development does not suffer undue negative impact and there will be no significant deterrence to future development;
>
> . . .
>
> 5. The use in the opinion of the County is reasonably related to the overall land use goals of the County and to the existing land use;
>
> . . .
>
> 7. The use shall not cause traffic hazard or congestion; and
>
> 8. Existing nearby properties shall not be adversely affected by intrusion of noise, glare or general unsightliness.

*Id.* § 8.04, subd. C. In addition to the CUP requirements, rural retail tourism uses must remain "small-scale and low-impact." *Id.* § 4.15, subd. D (Supp. 2011). "Small-scale" and "low-impact" land uses are ones that:

> 1. Do not create an excessive demand upon existing services or amenities;
>
> 2. Are screened or able to be screened adequately, or are sufficiently separated from adjacent development or land, to prevent undue negative impact to nearby properties;
>
> 3. Will not have an appearance that is inconsistent or incompatible with the surrounding area;
>
> 4. Will not cause traffic hazard or undue congestion;
>
> 5. Will not negatively impact the neighborhood by intrusion of noise, glare, odor, or other adverse effects.

*Id.*

8

The county board voted to deny the CUP based on its conflict with the rural retail tourism use, specifically the small-scale/low-impact requirement and the impact it will have on the neighborhood "by intrusion of noise, glare, odor, or other adverse effects." The county board relied on the criteria enumerated in the county zoning ordinances and thereby provided legally sufficient reasons for denying the CUP.[1]

**B.**

August also contends that the denial of his CUP lacks a factual basis because the noise created by the mounted shooting does not rise above the sound pressure levels promulgated by the MPCA and that the county board erroneously considered neighborhood comments.

**1.    Noise levels**

We note that our discussion of the noise decibel limits is in the context of a conditional-use application. The use at issue is not one permitted by the county's zoning ordinances. August contends that the county board cannot consider the effects of noise unless the noise meets or exceeds the controlling noise standards as determined by the responsible government entity. We disagree for the following reasons.

---

[1] August also challenges the county board's consideration of his application under the "rural retail tourism" criteria. The June 12, 2014 notes from a zoning department staff member state that a staff member discussed with August the option of proceeding with his CUP application as a "hybrid—commercial outdoor recreation processed as a rural retail tourism so as to emphasize the tourism draw—out of town visitors etc." Furthermore, in a June 12, 2014 letter sent by August to the zoning department, August explained how the CUP would contribute to the purpose of rural retail tourism. In this letter, August noted that existing nearby properties would be adversely affected by noise. Thus, the county board's reliance on the rural retail tourism criteria should not come as a surprise to August.

9

First, a plain reading of section 7.05 does not suggest, as August contends, that it is in conflict with the MPCA regulations. Section 7.05 of the county's zoning ordinances provides:

> Noise and vibrations generated from any use shall be in compliance with Minnesota Pollution Control Agency rules. Any use established shall be so operated that no undue or objectionable noise resulting from said use is transmitted beyond the boundaries of that plat line of the site on which such use is located. This standard shall not apply to incidental traffic, parking, loading, construction, or temporary maintenance operations.
> Any use creating periodic earth-shaking vibration shall be prohibited if such vibrations are perceptible to persons beyond the lot line of the site on which the use is located. The standard shall not apply to vibrations created during the process of construction.

CCO § 7.05 (2008). Minnesota Statutes section 116.07, subdivision 2(c) (2014), requires that "[n]o local governing unit shall set standards describing the maximum levels of sound pressure which are more stringent than those set by the Pollution Control Agency." Because section 7.05 requires that the noise generated from "any use" shall comply with the MPCA's noise standards, we fail to see how the county ordinance is in conflict with Minn. Stat. § 116.07, subd. 2(c).[2] The county ordinance does not establish more stringent noise standards.

_____

[2] We note that the legislature has exempted "skeet, trap or shooting sports clubs" from any "standards adopted by any state agency for limiting levels of noise in terms of sound pressure which may occur in the outdoor atmosphere." Minn. Stat. § 116.07, subd. 2a (2014). Thus, August's reliance on rule 7030.0040 of the Minnesota Administrative Rules is not persuasive. Moreover, rule 7030.0040 provides that "these standards do not, by themselves, identify the limiting levels of impulsive noise." Impulsive noise is defined as "either a single sound pressure peak (with either a rise time less than 200 milliseconds or total duration less than 200 milliseconds) or multiple sound pressure

10

Furthermore, section 7.05 does not establish noise standards different from those promulgated by the MPCA. Rather, the zoning ordinances require that a CUP applicant demonstrate that the noise created by the proposed use will not adversely affect neighboring properties, and the rural retail tourism sections require that the use will not impact the neighborhood by intrusion of noise. Accordingly, section 7.05 is not in conflict with the MPCA noise standards, as it does not define any decibel limits for noise considerations.

Second, August's argument, in essence, urges this court to adopt, as a matter of law, the proposition that a governing body can consider the effect noise will have on surrounding properties *only if* the noise level surpasses the sound level limits promulgated by the MPCA. Not only did our research reveal no caselaw supporting this proposition but, under our statutory scheme, this proposed rule could place a governing body or property owner at risk for a Minnesota Environmental Rights Act (MERA), Minn. Stat. §§ 116B.01-.13 (2014), violation. *See, e.g.*, *State by Drabik v. Martz*, 451 N.W.2d 893, 896-97 (Minn. App. 1990) (upholding temporary injunction under MERA prohibiting certain conduct despite the county's prior grant of a CUP allowing conduct); *McGuire v. Cnty. of Scott*, 525 N.W.2d 583, 584 (Minn. App. 1994) (distinguishing between MERA violations based on enumerated government standards and those based on a general material adverse effect on the environment when homeowner brought

---

peaks (with either rise times less than 200 milliseconds or total duration less than 200 milliseconds) spaced at least by 200 millisecond pauses." Minn. R. 7030.0020, subp. 6 (2013). The noise created by mounted shooting would presumably qualify as "impulsive noise."

MERA claim against the county for a highway's violation of the noise pollution rules issued by MPCA); *see* Minn. Stat. § 116B.04 (2014) (requiring that a potential MERA claimant show that the defendant's conduct violates or is likely to violate "any environmental quality standard").

MERA permits any person to maintain a civil action for declaratory or equitable relief against another person "for the protection of the air, water, land, or other natural resources located within the state, whether publicly or privately owned, from pollution, impairment, or destruction." Minn. Stat. § 116B.03, subd. 1. "Pollution, impairment or destruction is any conduct by any person which violates, or is likely to violate, any environmental quality standard, [or] limitation . . . ." Minn. Stat. § 116B.02, subd. 5. Under MERA, the statutory definition of "person" includes "any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality." *Id.*, subd. 2. And the statutory definition of "natural resources" includes "quietude." *Id.*, subd. 4. Consequently, if a government entity could only consider noise from a proposed use that meets or exceeds the limits enumerated in the administrative rules or statutes then the entity could, by definition, only consider noise levels that establish a prima facie MERA violation. *See Minn. Pub. Interest Research Grp. v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 768 (Minn. 1977) (considering noise levels in the context of establishing a prima facie MERA violation even when the MPCA had not issued a standard regulating noise for skeet shooting); *Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc.*, 624 N.W.2d 796, 806 (Minn. App. 2001)

12

("But the legislature did not exempt shooting sports clubs from MERA claims, only from MPCA's regulatory authority.").

Next, August cites to Minn. Stat. § 87A.05 (2014) and asserts, without a cite to the record, that the noise from the mounted shooting would fall within the levels allowed by statute for shooting ranges. *See* Minn. R. Civ. App. P. 128.02(c) (requiring that each factual assertion be supported by a cite to the record). Upon reviewing the record, we could find nothing in it specifying the actual decibel level of the noise created by the mounted shooting events. The county zoning staff report stated that it estimated that noise from the property would not exceed the MPCA decibel limits, but the report did not confirm that noise level was measured in accordance with the statutory and administrative rules' guidelines. *See* Minn. Stat. § 87A.05 ("The noise level shall be measured outside of the range property at the location of the receiver's activity according to Minnesota Rules, parts 7030.0010 to 7030.0080.").

### 2.    Citizen observations

Next, August argues that the denial of his CUP lacked a factual basis because the county board erroneously relied on citizen evaluations and concerns. The county maintains that the county board is not limited to expert testimony in making a decision and can rely on observations by individuals. We agree.

August relies on *Scott Cnty. Lumber Co. v. City of Shakopee*, 417 N.W.2d 721, 727 (Minn. App. 1988), to support his proposition that the county board should not have relied on public comment but, instead, only relied on the zoning department's staff report. In *Scott Cnty. Lumber Co.*, the city council voted to deny a CUP to extract gravel from a

13

130-acre tract of land. *Id.* at 722. The CUP applicant met the 12 criteria laid out in the city's zoning code. *Id.* at 727. Additionally, it was "uncontroverted" that the applicant agreed to comply with 20 additional conditions imposed by the city, and multiple different experts testified that the conditions would mitigate "any environmental impacts in the form of noise, dust and water pollution and prevented traffic hazards." *Id.* Experts conducted environmental assessments and sound tests, and these tests supported granting the CUP. *Id.* at 722. Experts, landowners, city council members, and the city appraiser all testified at the district court. *Id.* at 722-26.

In reviewing the city's denial, this court first determined that the CUP applicant fully complied with all the specified standards in the city code in addition to the 20 additional requirements. *Id.* at 727. Testimony from engineers, a city planner, a soil scientist, and an environmental geologist recommended granting the CUP. *Id.* The neighboring landowners' testimony expressed their personal opinions regarding the effect of the gravel operation and provided no expert opinion to support their opinions. *Id.* at 728.

In concluding that the city council's denial of the CUP was arbitrary, we explained that "[c]ommunity opposition to a landowner's desire to use his property for a particular purpose is not a legally sufficient reason for denying a conditional use permit," and that the denial must "be based on something more concrete." *Id.* at 728; *see C. R. Investments, Inc. v. Vill. of Shoreview*, 304 N.W.2d 320, 325 (Minn. 1981) (stating that neighbors' objections to conditional-use permit application must be based on more than conjecture or speculation); *Yang*, 660 N.W.2d at 833 (finding neighbors' anecdotal

14

comments insufficient when they contained no detail as to how the cars they witnessed may affect traffic circulation).  Ultimately, the *Scott Cnty. Lumber Co.* court found that the neighbors' testimony was preferred over the experts' testimony without any adequate supporting reasons and granted the CUP.  417 N.W.2d at 728.  Moreover, it was uncontroverted that the CUP applicant agreed to comply with the 20 additional conditions imposed by the city to minimize the environmental impact of the project.  *Id.* at 727-28.

Unlike the neighbors' testimony in *Scott Cnty. Lumber Co.*, a municipal entity may consider neighborhood opposition when it is based on something more concrete than non-specific neighborhood opposition.  *See Roselawn Cemetery v. City of Roseville*, 689 N.W.2d 254, 260 (Minn. App. 2004) ("A city council is free to disregard an expert's opinion when it is presented with conflicting non-experts' opinions, including those of area residents, so long as the reasons are concrete and based on observations, not merely on fear or speculation.");  *SuperAmerica Grp., Inc. v. City of Little Canada*, 539 N.W.2d 264, 267 (Minn. App. 1995) (listing cases involving preference for non-expert, landowners' opinions over expert opinions), *review denied* (Minn. Jan. 5, 1996).  In contrast to *Scott Cnty. Lumber Co.*, in *RDNT, LLC*, the supreme court determined that the city's consideration of "detailed factual complaints from the neighborhood," in addition to traffic studies and engineer testimony stating that traffic would increase, provided a sufficient factual basis to determine that the increase in traffic would harm or injure the neighborhood, public health, safety, and welfare.  861 N.W.2d at 77.  The CUP applicant argued that the city had no factual basis to deny the application because the streets were not near capacity as acknowledged by the city's engineer and a consulting group.  *Id.* at

15

76. In upholding the denial of the CUP, the supreme court noted that "the City determined that street capacity alone was not dispositive as to whether an increase in traffic injures the neighborhood or otherwise harms the public health, safety, and welfare." *Id.* at 77.

Here, it is uncontested that the proposed use of the property will result in noise audible by all neighboring properties. The neighborhood opposition to the mounted shooting was based on neighboring residents' personal experiences with the resulting noise and increase in traffic caused by the mounted shooting events. In 2008, August built the arena on his 20-acre tract of property less than 500 feet from neighboring homes. Without obtaining a CUP, August has hosted mounted shooting competitions since 2011. Residents of the neighboring properties described their personal experiences with the noise caused by 1,500 to 2,000 of fired rounds per weekend. Accordingly, the observations and comments are not speculative, and the county board properly relied on these statements in its determination.

Furthermore, members of the planning commission visited the property and heard, firsthand, the noise caused by the mounted shooting events and relied on these observations when making their recommendation. In sum, the county board reasonably relied on the landowners' concerns and planning commission members' observations and therefore had a sufficient factual basis to determine that the increase in noise would adversely affect the neighborhood. Thus, the county board's decision to deny the CUP was not unreasonable, arbitrary, or capricious.

16

## II.

August, on appeal, contends that he is entitled to attorney fees under Minn. Stat. § 549.211 (2014). Rule 139.06, subdivision 1, of the Minnesota Rules of Civil Appellate Procedure requires a party seeking attorney fees to submit a motion for the requested fees under rule 127. In addition to a separate motion, the rule mandates that the motion for fees "must include sufficient documentation to enable the appellate court to determine the appropriate amount of fees." Minn. R. Civ. App. P. 139.06, subd. 1. Here, August did not file a motion for attorney fees nor did he provide the court with an appropriate calculation of his fees. Accordingly, an award of attorney fees is not appropriate here. *See Johnson v. Johnson*, 627 N.W.2d 359, 364-65 (Minn. App. 2001) (declining to award a party attorney fees when party did not request fees by motion).

## D E C I S I O N

Because the county board did not err in considering noise that did not reach the decibel levels promulgated by the MPCA, and its decision was supported by a sufficient factual basis, its denial of August's CUP was not unreasonable, arbitrary, or capricious.

**Affirmed.**